UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Criminal No. Cr-05-404 (RMC) |
| v. ) | |
| ) | |
| ADAN CASTILLO and ) | |
| JORGE AGUILAR ) | |
| _____) | |

## RESPONSE TO DEFENDANT AGUILAR'S MOTION TO SUPPRESS THE SOUND AND THE TRANSCRIPT RELATING TO THE NOVEMBER 7, 2005 MEETING

Comes now the United States of America, by and through Kenneth A. Blanco, Chief, Narcotics and Dangerous Drugs, Department of Justice, and Paul W. Laymon, and Michael Mota, Trial Attorneys, Narcotic and Dangerous Drugs, and responds to the motion to suppress the sound and the transcripts relating to the November 7, 2005 videotaped meeting between the defendants and the informants.  The motion should be denied.

Defendant Castillo was the head of the Guatemalan drug enforcement agency and defendant Aguilar was his chief deputy.  A DEA informant, posing as a Colombian drug dealer, met with the defendants on November 7, 2005 at a hotel restaurant in Guatemala City.  There was a second informant present.  The purpose of the meeting was to further discuss how Castillo and Aguilar could help the informant move cocaine through the port at Santo Tomas, Guatemala. At the meeting, the third such meeting between Castillo and the informant and the second such meeting between the informant and Aguilar,  Castillo accepted a magazine containing thousands of dollars in US currency.  Afterwards, both Castillo and Aguilar spoke openly about helping the informant move a large amount of cocaine through the port at Santo Tomas.  The meeting was

videotaped, meaning that there is both picture and sound on the videotape.

The video runs for approximately 83 minutes, but the two defendants do not arrive at the meeting and do not appear on the video until about 9 minutes and 22 seconds into the video. The video provided to the court is actually on seven CD's. The original recording was downloaded into a computer and the CD's were made from the computer copy. Each CD contains approximately 13 minutes of video, except the last CD which contains about five minutes. (There are seven CD's because each CD can hold only about 13 minutes worth of picture and sound.) In the first few minutes of the first CD, the informant is apparently being fitted with a recording device, and there is a brief scene of a men's room. Thereafter, the informant is sitting in the restaurant waiting for the defendants to arrive. The defendants are seen on the video from the time of their arrival, about 10 minutes into the recording, until they leave at about two minutes and 10 seconds into the seventh CD. The video then goes on for a few minutes as it is disengaged.

The undersigned has several times reviewed the video. The undersigned recently listened to the entire video using headphones connected to a set of external speakers connected to the laptop which was playing the video. The undersigned also listened to the video CD's with just external speakers connected to the laptop, that is, with no earphones. Either way, the conversation was audible. Throughout the video, the camera is usually focused on the faces of Castillo, or Aguilar, or both. At the beginning, the camera focuses on only Castillo's hands and arms. After the two defendants arrive at the restaurant, at the beginning of the second CD for example, the camera is focused on Castillo's hands and the viewer can see Castillo accepting a magazine containing a large quantity of currency. Later in the second CD, and for most of the meeting thereafter, the camera is focused on the face of either Castillo, or Aguilar, or both. At

this meeting on November 7, both Castillo and Aguilar talk to the informants. Sometimes when the camera is focused on Castillo alone, Aguilar or one of the informants will be talking and cannot be seen, but the words are still audible. But as the video goes on, the camera focuses clearly on Aguilar, or both Aguilar and Castillo, who are seated next to each other at the table. For a lot of Aguilar's comments, the camera is focused on him. There is American rock music in the background, along with background restaurant sounds, and when the speakers have a lull in their conversation or talk more quietly, the American music occasionally can be clearly heard.

In CD 1, at nine minutes and 22 seconds (hereafter, the minutes and seconds will be noted as 9:22, for example) into the video, Aguilar and Castillo appear in the restaurant. Aguilar has a moustache and is wearing a baseball type cap, while Castillo has on a light colored sweater. They sit on the same side of the table, and in the video Castillo appears on the right of the screen and Aguilar appears on the left of the screen. They remain in those positions throughout the video, drinking and eating and talking.

In the opinion of the undersigned, who does not speak Spanish, the sound is quite audible. A listener versed in Spanish, particularly one familiar with Colombian and Guatemalan accents, as the two translators were, should be able to understand most of what is being said. When listening on ear phones, it is possible to hear the Spanish conversation going on in the foreground and yet understand familiar American music playing in the background. The Spanish conversation between the two defendants and the two informants can usually be clearly heard. Sometimes the defendants and the informants talk at the same time or talk over each other, but generally the conversation is clear. When listening on earphones, the listener can sometimes hear both the Spanish conversation and the American background music equally well. For example, on the second CD, one can clearly hear the song "Breakaway", performed by the

American singing artist Kelly Clarkson, the first winner of the popular American Idol television singing competition. In later sections of the recording, one can hear snatches of the 1960's song "Mr. Lonley", and much of two recent hits by the American singing group, Maroon 5. Throughout the background music, the Spanish conversation can still be heard.

A transcript of the November 7 meeting was prepared by two DEA Spanish speaking transcribers. Their statements are attached to and made a part of this response. Each of them listened to the videotape and assisted in preparing a transcript of what was said at the meeting. Their opinions as to the audibility of the recording are set out in their statements. One of the transcribers was particularly familiar with the accent and idioms used by Colombian speakers and Guatemalan speakers. The key informant used a very effective Colombian accent, while the two defendants of course spoke with a Guatemalan accent. This transcriber opined that the sound was 90% audible. The two translators prepared a draft transcript, and then the informant sat down with transcriber Elisa Lambert and helped her work through parts of the video where the speakers spoke at the same time or spoke over each other. That final transcript, in English, is attached and made part of this response.

As noted above, at about 9:22 into CD1, Aguilar and Castillo arrive at the restaurant and are seated. From there until the end of CD1, the camera is generally focused on Castillo's hands and midsection. CD2 continues with the same view and at 3:09 Castillo is handed a magazine. At 3:18 Castillo opens the magazine and at 3:26-27 the money inside the magazine is visible. By about 7:50, the camera moves up to focus on Aguilar and a bottle of ketchup. By 9:00 in CD2, Aguilar's face is clearly visible, framed by the ketchup and salt/pepper shakers. Beginning at about 10:10 and going to about 12:50 in CD2, Kelly Clarkson's recording of "Break Away" can be heard in the background. ("Out of the darkness and into the sun, but I

won't forget all the ones that I love, I'll take a risk, take a chance, make a change, and break away"). The camera remains on Aguilar until the end of CD2. On CD3, Aguilar is on camera until about 7:20, when the camera shifts back to the table and Castillo's hands. At about 8:10, Castillo's face can be seen and then by 9:30 of CD3, both Aguilar and Castillo are visible. From about 10:00 until the end of CD3, the camera focuses mostly on Castillo.

As CD4 begins, the camera picks up both Castillo and Aguilar. At about 3:00 of CD4, bits of the song "Mr. Lonely" can be heard in the background for a few seconds. ("I'm Mr. Lonely, I have no body to call my own....") Until about 10:25 of CD4, the camera focuses on Aguilar and Castillo, and then moves back to Castillo for a few seconds, then picks up both again. At the end of CD4, the camera is focused on Castillo. At the beginning of CD5, the camera focuses on Castillo, but by 1:26 it shifts to Aguilar and remains on Aguilar until about 10:00, when it shifts back to Castillo. By the end of CD5, the camera is focused on both. As CD6 begins, the camera is focused on both Aguilar and Castillo. By 3:20 of CD6 and up until after 5:00, the song "And she will be loved", by the American group Maroon 5, can be heard in the background. ("Ask her if she wants to stay awhile, and she will be loved, and she will be loved".) For most of CD6, the camera captures both Aguilar and Castillo, as about half of their faces are visible most of the time. At 11:50 of CD6, Aguilar gets a phone call on his cell phone and he can be heard saying "hello, hello". On CD7, the camera is tilted up at 00:46, and by 1:48 Aguilar and Castillo stand up to leave. By 2:09, Castillo and Aguilar walk away, and shortly thereafter the camera tilts up again, the picture is gray, and then by 4:06 the video ends.

The admission of tape recordings at trial rests with the sound discretion of the trial court. *United States v. Slade,* 627 F.2d 293, 301 (D.C.Cir 1980*), citing Monroe v. United States,* 234 F.2d 49, 55, cert. denied, 352 U.S. 933 (1956). The first criteria for admission is that the

tapes be authentic, accurate, and trustworthy. *Slade,* 627 F.2d at 301 (citation omitted). The second criteria for admission is that the tapes be audible and comprehensible enough for the jury to consider the contents. Tapes are admissible unless any unintelligible portions are so substantial as to render the recording as a whole untrustworthy. *Id.* The Court of Appeals put the standard more succinctly when it noted that admission of tapes is committed to the sound discretion of the district court, so long as the tapes are authentic and intelligible. *United States v. Sandoval,* 709 F.2d 1553, 1554 (D.C.Cir. 1983) The ideal procedure for testing accuracy of the tapes is to have the two sides stipulate to a transcript. When that is not done, the "second best alternative" is for the district court to listen to the tapes pretrial by reading the transcript against the tapes. *Slade* 627 F.2d at 302. Of course, here, the tapes are in Spanish, so reading the transcript against the tapes is of less utility, but is still valuable for identifying who is speaking and whether what is being said is probative.

The government has been unable to find any District of Columbia cases dealing specifically with determining the audibility of Spanish language tapes. A Fifth Circuit case is illuminating. In *United States v. Sutherland,* 656 F.2d 1181, 1199-1200 (5th Cir. 1981), the court noted that Spanish language tapes admitted into evidence "were of poor quality and often unintelligible", but the Court of Appeals found no abuse of discretion where the district court admitted the tapes. The Fifth Circuit noted that recordings should be excluded only if the inaudible or unintelligible portions are so substantial as to render the recording as a whole untrustworthy. *Id.* An even more illuminating case is the opinion of the district court in *In re Audibility of Certain Recorded Conversations, United States v. Gerena,* 691 F. Supp 588 (D. Conn. 1988). In a very meticulous and lengthy opinion, the district court discussed the procedures it used to determine, pretrial, the audibility of 61 challenged conversations, which

were mostly in Spanish. Of particular note to the instant case, the district court noted the standard for admissibility was that tapes are admissible "unless the unintelligible portions are so substantial as to render the (conversation) as a whole untrustworthy". *Gerena,* 691. F.Supp at 593 (citation omitted). This is the same standard used in the District of Columbia. The district court judge in *Gerena* spoke Spanish but noted that a presiding judge who does not know the language is not precluded from determining audibility. *Id.* at 591. The district court made its audibility determination by listening to the tapes, in chambers, generally with the aid of transcripts so as to better determine probative value. *Id* at 599-600, 603.

In the case of foreign language tapes, an English translation of the Spanish transcript is shown to the jury. See for example, *United States v. Sutherland,* 656 F.2d 1181, 1200 (5th Cir. 1981). A transcript may help a juror follow the conversation when the tape is of questionable clarity or contains speakers who talk over each other or speak in quick succession. *United States v. Holton,* 116 F.3d 1536, 1540 (D.C.Cir. 1997). The district court should decide if transcripts should be admitted into evidence as an aid to the jury, that is, whether the transcripts will be admitted into evidence, and whether jury may use the transcripts during deliberations as well as at trial. *Holton,* 116 F.3d at 366.

As to the first criteria for admission, that the tapes be authentic, accurate, and trustworthy, the government will produce at trial the agents who provided the recording devices to the informant and the agents who surveilled the meeting on November 7, as well as the informant who took the video and was part of the conversation. In addition, the government will produce at trial the two DEA translators who listened to and translated the tape into Spanish, and then produced an English transcript from the Spanish transcript. As to the second criteria for admission, that the tape be audible, the sound portion of the November 7 meeting is audible.

The conversation involving the two defendants and the informants is comprehensible, and can be reduced to a reliable Spanish transcript which can be translated accurately into English. A non Spanish speaker can discern that the Spanish conversation is audible, by listening to the Spanish conversation and picking up the clarity of the voices, and, if the listener is familiar with teenage American rock music, the listener can pick out some American lyrics in the background. Although there are parts of the conversation where two people talk at the same time or in quick succession, and thus it may be difficult to discern what is being said, any such unintelligible portions are minimal and do not render the recording as a whole untrustworthy. The conversation is clearly probative, as both defendants implicate themselves in the presumed Colombian drug dealer's plan to ship cocaine through the port of Santo Tomas.

Assuming the court determined that the sound portion of the November 7 video was audible, what would remain would be to determine how the Spanish and English transcripts were presented to the jury. But that is a different question from whether the sound is audible.

Accordingly, the defendant's motion should be denied and the government should be permitted to play to the jury the sound portion of the November 7 videotaped meeting.

Respectfully submitted,

_____
Paul W. Laymon
Trial Attorney
Narcotic and Dangerous Drugs
Department of Justice, Suite 8414
1400 New York Avenue, N. W.
Washington, DC 20005
Phone        202-514-1286
Facsimile    202-514-1483