

United States Court of Appeals,District of Columbia
Circuit.
UNITED STATES of America
v.
Bernard L. BARKER, Appellant.
UNITED STATES of America
v.
Eugenio R. MARTINEZ, Appellant.
**Nos. 74-1883, 74-1884.**

Argued 18 June 1975.
Decided 17 May 1976.

Defendants, members of a "special investigations" unit of the White House which burglarized a psychiatrist's office in search of records on a patient who was suspected of having "leaked" classified government documents, were convicted in the United States District Court for the District of Columbia, Gerhard A. Gesell, J., of conspiring to violate the psychiatrist's civil rights, and they appealed. The Court of Appeals held that reversal was required.

Reversed.

Wilkey, Circuit Judge, and Merhige, District Judge, filed opinions in support of reversal.

Leventhal, Circuit Judge, dissented and filed opinion.

West Headnotes

**[1] Conspiracy 91 ⟶38**

91 Conspiracy
    91II Criminal Responsibility
        91II(A) Offenses
            91k38 k. Defenses. Most Cited Cases
In prosecution of members of "special" investigations unit of White House for conspiracy to violate constitutional rights of psychiatrist by burglarizing psychiatrist's office in search of records on patient who had allegedly "leaked" classified government documents, the court reversed a conviction on the ground that the trial judge had erred in applying the general rule that mistake of law is not a defense, and had failed to permit consideration by the jury under one of the exceptions to that rule: Judge Wilkey, on the theory of reasonable and good faith reliance on the apparent authority of an official by citizens recruited to aid him on a special assignment, and Judge Merhige, on the theory of action in reliance on a government official's misstatement of the law. 18 U.S.C.A. § 241.

**[2] Conspiracy 91 ⟶29.5(1)**

91 Conspiracy
    91II Criminal Responsibility
        91II(A) Offenses
            91k29.5 Conspiracy Against Exercise of Civil Rights
                91k29.5(1) k. In General. Most Cited Cases
                (Formerly 91k29.5)
Conviction under statute making it crime to conspire to deprive citizen of his constitutional rights requires proof that offender acted with a specific intent to interfere with federal rights in question; such requirement does not mean that defendant must have acted with subjective awareness that his action was unlawful; it is enough that he intentionally performed acts which, under circumstances of case, would have been clearly in violation of federal law, absent any other defense. 18 U.S.C.A. § 241.

**[3] Conspiracy 91 ⟶29.5(1)**

91 Conspiracy
    91II Criminal Responsibility
        91II(A) Offenses
            91k29.5 Conspiracy Against Exercise of Civil Rights
                91k29.5(1) k. In General. Most Cited Cases
                (Formerly 91k29.5)
In prosecution of defendants for conspiring to deprive psychiatrist of his constitutional rights, it was not necessary for conviction that defendants' unauthorized search of psychiatrist's office was predominant, as opposed to incidental, purpose of conspiracy; even if defendants had as their primary objective photographing of psychiatrist's patient's medical file, necessary "specific intent" to violate psychiatrist's constitutional rights was present so long as one of purposes of unlawful entry was to search psychiatrist's office without warrant or his consent. 18 U.S.C.A. § 241.

**[4] Criminal Law 110 ⟶33**

546 F.2d 940                                                                                    Page 2
546 F.2d 940, 178 U.S.App.D.C. 174
**(Cite as: 546 F.2d 940)**

110 Criminal Law
    110II Defenses in General
        110k33 k. Ignorance or Mistake of Fact. Most Cited Cases
Honest mistake of fact negatives criminal intent when defendant's acts would be lawful if facts were as he supposed them to be.

**[5] Criminal Law 110 &#128273;32**

110 Criminal Law
    110II Defenses in General
        110k32 k. Ignorance or Mistake of Law. Most Cited Cases
Mistake of law will not generally excuse commission of offense; thus, defendant's error as to his authority to engage in particular activity, if based upon mistaken view of legal requirements or ignorance thereof, is mistake of law, and fact that he relied upon erroneous advice of another is not, typically, an exculpatory circumstance; he will still be deemed to have acted with culpable state of mind.

**[6] Searches and Seizures 349 &#128273;113.1**

349 Searches and Seizures
    349II Warrants
        349k113 Probable or Reasonable Cause
            349k113.1 k. In General. Most Cited Cases
            (Formerly 349k113, 349k7(6))
Government search and seizure is not rendered lawful under Fourth Amendment by simple fact that warrant has been obtained; search is constitutionally proper only if accompanying warrant is based on legally sufficient probable cause; factual mistake as to whether warrant has been obtained, therefore, would not necessarily excuse unlawful search, since that search would not necessarily have been legal under facts as defendant believed them to be. U.S.C.A.Const. Amend. 4.

**[7] Criminal Law 110 &#128273;32**

110 Criminal Law
    110II Defenses in General
        110k32 k. Ignorance or Mistake of Law. Most Cited Cases
        (Formerly 349k3.4)

**Searches and Seizures 349 &#128273;101**

349 Searches and Seizures
    349II Warrants

        349k101 k. In General. Most Cited Cases
That recipient of warrant may have relied upon opinion of judge in determining that he had legally adequate probable cause to make search does not, under traditional analysis, render search legal if there was no such probable cause; his mistake remains one of law, and, under strict construction of rule that mistake of law is no defense to criminal liability, such mistake will not excuse his unlawful act. U.S.C.A.Const. Amend. 4.

**[8] Criminal Law 110 &#128273;32**

110 Criminal Law
    110II Defenses in General
        110k32 k. Ignorance or Mistake of Law. Most Cited Cases
Although basic policy behind mistake of law doctrine is that, at their peril, all men should know and obey the law, in certain situations there is overriding societal interest in having individuals rely on authoritative pronouncements of officials whose decisions we wish to see respected.

**[9] Criminal Law 110 &#128273;32**

110 Criminal Law
    110II Defenses in General
        110k32 k. Ignorance or Mistake of Law. Most Cited Cases
Mistake of government agent in relying on magistrate's approval of search can be considered virtually per se reasonable, thus qualifying agent for exception to mistake of law doctrine. U.S.C.A.Const. Amend. 4.

**\*941 \*\*175** Appeals from the United States District Court for the District of Columbia (D.C. Criminal 74-116).

Daniel E. Schultz, Washington, D. C. (appointed by this Court), for appellants Barker and Martinez.
Philip B. Heyman, Sp. Asst. to the Special Prosecutor, with whom Henry S. Ruth, Jr., Special Prosecutor, Peter M. Kreindler, Counsel to the Special Prosecutor, Washington, D. C., Maureen E. Gevlin and Richard D. Weinberg, Asst. Sp. Prosecutors, Washington, D. C., were on the brief for appellee. Leon Jaworski, Special Prosecutor at the time the record was filed, Washington, D. C., entered an appearance as Special Prosecutor.
Ivan Michael Schaeffer, Atty., Dept. of Justice, Washington, D. C., filed a memorandum on behalf of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the U. S. as amicus curiae.

Appellants Bernard L. Barker and Eugenio R. Martinez were convicted by a jury of the United States District Court for the District of Columbia of conspiracy to violate the civil rights of Dr. Lewis J. Fielding, in violation of 18 U.S.C. s 241. Appellants were members of the "Special Investigations" unit which burglarized Dr. Fielding's office in search of records on his patient, Daniel Ellsberg. The convictions were appealed to the United States Court of Appeals, where argument was heard in conjunction with the companion appeals of **942 **176 John D. Ehrlichman and G. Gordon Liddy. In opinions by Judges Wilkey and Merhige, to which Judge Leventhal dissents in part, the convictions of Barker and Martinez are reversed.

The opinions by the majority deal with two substantial points raised on appeal. First, Appellants argue that the conviction under 18 U.S.C. s 241 must be reversed because the specific intent requirement of that statute has not been met. Barker and Martinez assert that the requisite specific intent is present only where the conspirators' predominant purpose is an act in violation of civil rights, and thus that it is lacking in this case where the primary objective was the inspection of Ellsberg's records rather than the burglary of Dr. Fielding's office. Citing Anderson v. United States, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974), the court unanimously rejects this argument on the basis that specific intent is present whether actions violating federal civil rights are a predominant or incidental objective of the conspiracy. (Wilkey op. at -- - -- of 178 U.S.App.D.C., at 948 of 546 F.2d, Merhige op. at 174 of 178 U.S.App.D.C., at 954 of 546 F.2d, Leventhal op. at -- - -- of 178 U.S.App.D.C., at 970-971 of 546 F.2d).

Second, Appellants challenge their convictions on the ground that the District Court's evidentiary rulings and jury instructions denied them the opportunity to prove a defense of good faith reliance on apparent authority. More specifically, Barker and Martinez complain: (1) that evidence was excluded as to the reasonableness of their belief in the authority of E. Howard Hunt, their White House superior, to order such an operation; and (2) that the District Court rejected a proposed jury instruction allowing a defense for reasonable, good faith reliance on apparent authority, and instructed instead that absent belief that a valid warrant had been obtained, any mistake as to the legality of the operation was no defense.

Judges Wilkey and Merhige conclude that the District Court erred in rejecting the possibility of a limited mistake of law defense. While both recognize the general rule that a mistake of law is no defense, they conclude that the District Court's refusal to recognize an exception to that doctrine possibly applicable to this case requires reversal of the convictions.

Judge Wilkey states that Appellants might have been able to bring themselves within an exception to the mistake of law doctrine relating to assistance of a governmental official in the performance of a governmental function. In order to establish such a defense they would have to prove (1) facts justifying their reasonable reliance on Hunt's apparent authority and (2) a plausible legal theory under which Hunt could in fact have such authority. He concludes that the facts justifying reliance might have been proven had the court admitted the evidence offered by Appellants, and that a plausible legal theory supporting such a defense is presented by the longstanding Justice Department view that the President may authorize warrantless searches related to foreign espionage or intelligence. (Wilkey op. at -- - -- of 178 U.S.App.D.C., at 949-953 of 546 F.2d).

Judge Merhige finds possibly applicable to Appellants an exception to the mistake of law rule for reasonable reliance upon official interpretations of the law. He states that the jury could have concluded that Assistant to the President, John Ehrlichman, had expressed or implied that the break-in was legal under a national security rationale, and that this view was relayed to Appellants by Hunt. Further, in view of the substantial power of the Executive Branch in the field of foreign affairs, a jury could further find that Appellants acted reasonably in relying on this interpretation of the law. (Merhige op. at -- - -- of 178 U.S.App.D.C., at 954-957 of 546 F.2d).

The convictions are accordingly REVERSED.

Judge Leventhal dissents on the ground that Appellants have failed to allege facts which might bring them within any established exception to the doctrine that a mistake of law is no defense.

Before LEVENTHAL and WILKEY, Circuit Judges, and MERHIGE, [FN*] United States District Judge for the Eastern District of Virginia.

FN* Sitting by designation pursuant to 28 U.S.C. s 292(d).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

546 F.2d 940                                                                    Page 4
546 F.2d 940, 178 U.S.App.D.C. 174
**(Cite as: 546 F.2d 940)**

Opinion Per Curiam.

Circuit Judge WILKEY and District Judge MERHIGE filed opinions reversing the judgment of the District Court.

Dissenting Opinion filed by Circuit Judge LEVENTHAL.

PER CURIAM:

[1] The mandate of the court is that the Judgment of the District Court is reversed and the case is remanded for a new trial. Judges Wilkey and Merhige have filed separate opinions. Judge Leventhal dissents.

WILKEY, Circuit Judge:

Two of the "footsoldiers" of the Watergate affair, Bernard Barker and Eugenio Martinez, are with us again. They haven't been promoted, they are still footsoldiers. They come before us this time to challenge their convictions under 18 U.S.C. s 241, for their parts in the 1971 burglary of the office of Dr. Lewis J. Fielding.

## I. FACTS

During the summer of 1971, following the publication of the now famous "Pentagon Papers," a decision was made to establish a unit within the White House to investigate leaks of classified information. This "Room 16" unit, composed of Egil Krogh, David Young, G. Gordon Liddy, and E. Howard Hunt and under the general supervision of John Ehrlichman determined, or was instructed, to obtain all possible information on Daniel Ellsberg, the source of the Pentagon Papers leak.[FN1] After Ellsberg's psychiatrist, Dr. Fielding, refused to be interviewed by FBI agents, the unit decided to obtain copies of Ellsberg's medical records through a covert operation.

> FN1. A more detailed discussion of the organization and purpose of the "Room 16" unit is in our opinion in United States v. Ehrlichman, No. 74-1882, 178 U.S.App.D.C. --, at pp. -- - --, 546 F.2d 910, at pp. 914-915.

Hunt had been a career agent in the CIA before his employment by the White House. One of his assignments was as a supervising agent for the CIA in connection with the Bay of Pigs invasion, and, as "Eduardo," he was well known and respected in Miami's Cuban-American community. A fact destined to be of considerable importance later, he had been Bernard Barker's immediate supervisor in that operation. When the "Room 16" unit determined that it would be best if the actual entry into Dr. Fielding's office were made by individuals not in the employ of the White House, Hunt recommended enlisting the assistance of some of his former associates in Miami.

Hunt had previously reestablished contact with Barker in Miami in late April 1971, and he met Martinez at the same time. He gave Barker an unlisted White House number where he could be reached by phone and wrote to Barker on White House stationery. On one occasion Barker met with Hunt in the Executive Office Building. By August 1971 Hunt returned to Miami and informed Barker that he was working for an organization at the White House level with greater jurisdiction than the FBI and the CIA. He asked Barker if he would become "operational" again and help conduct a surreptitious entry to obtain national security information on "a traitor to this country who was passing . . . classified information to the Soviet Embassy." He stated further that "the man in question . . . was being considered as a possible Soviet agent himself."

Barker agreed to take part in the operation and to recruit two additional people. He contacted Martinez and Felipe deDiego. Barker conveyed to Martinez the same information Hunt had given him, and Martinez agreed to participate. Like Barker, Martinez had begun working as a covert agent for the CIA after Castro came to power in Cuba. Although Barker's formal **944 **178 relationship with the CIA had ended in 1966, Martinez was still on CIA retainer when he was contacted.

Both testified at trial that they had no reason to question Hunt's credentials. He clearly worked for the White House and had a well known background with the CIA. During the entire time they worked for the CIA, neither Barker nor Martinez was ever shown any credentials by their superiors. Not once did they receive written instructions to engage in the operations they were ordered to perform. Nevertheless, they testified, their understanding was always that those operations had been authorized by the Government of the United States. That they did not receive more detail on the purpose of the Fielding operation or its target was not surprising to them; Hunt's instructions and actions were in complete accord with what their previous experience had

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

taught them to expect. They were trained agents, accustomed to rely on the discretion of their superiors and to operate entirely on a "need-to-know" basis.

On 2 September 1971 Hunt and Liddy met Barker, Martinez, and deDiego at a hotel in Beverly Hills, California. Hunt informed the defendants that they were to enter an office, search for a particular file, photograph it, and replace it. The following day the group met again. Hunt showed Barker and Martinez identification papers and disguises he had obtained from the CIA. That evening the defendants entered Dr. Fielding's office. Contrary to plan, it was necessary for them to use force to effect the break-in. As instructed in this event, the defendants spilled pills on the floor to make it appear the break-in had been a search for drugs. No file with the name Ellsberg was found.

The next day Barker and Martinez returned to Miami. The only funds they received from Hunt in connection with the entry of Dr. Fielding's office were reimbursement for their living expenses, the costs of travel, and $100.00 for lost income.

On 7 March 1974 the defendants were indicted under 18 U.S.C. s 241, along with Ehrlichman, Liddy, and deDiego for conspiracy to violate the Fourth Amendment rights of Dr. Fielding by unlawfully entering and searching his office. On 7 May 1974 the defendants filed a Motion for Discovery and Inspection with an accompanying memorandum outlining, inter alia, their proposed defense of absence of mens rea due to a mistake of fact mixed with law attributable to their reasonable reliance on apparent authority.[FN2] On 24 May 1974, in a memorandum order, the District Court rejected the defendants' position on the ground that "a mistake of law is no defense." [FN3]

FN2. Barker Appendix at 55.

FN3. United States v. Ehrlichman, 376 F.Supp. 29, 35 (D.D.C.1974).

On 12 July 1974 the jury returned verdicts of guilty against both Barker and Martinez.

## II. LEGAL ISSUES

The court's determination at the outset that a mistake of law could not excuse defendants' conduct led to two important legal errors which require reversal of the Barker and Martinez convictions.

First, the defendants were prevented during the trial from offering complete evidence as to the reasonableness of their belief in Hunt's authority to engage them in the Fielding operation.[FN4]

FN4. See generally Offer of Proof, Barker Appendix at 86.

Second, at the end of the trial, the District Court rejected the defendants' proposed instructions setting forth their theory of the case.[FN5] The jury was advised that to convict they need find only that the purpose of the break-in was to enter and search Dr. Fielding's office without a warrant or his permission, and for governmental rather than purely private purposes; a mistake as **945 **179 to the legality of such an operation was no defense.[FN6]

FN5. Barker Appendix at 104-05.

FN6. Tr. 2525-26:
In order to establish the requisite intent the Prosecutor must show that the object of the conspiracy and the purpose of each defendant was to carry out a warrantless entry into and search of Dr. Fielding's office without permission.
In determining whether or not each defendant had the requisite intent, you should keep in mind that a mistake of fact may constitute a defense to the conspiracy charge but a mistake of law is not a defense.
Thus, if one of the defendants honestly believed that a valid warrant had been obtained, such a mistake of fact would render him innocent of the alleged conspiracy because it cannot be said that he intended to conduct a warrantless search.
On the other hand, if the defendant was fully aware of the relevant facts that the search lacked both warrant and Dr. Fielding's permission, but erroneously believed that the search was still legal, that would constitute a mistake of law and a mistake of law is no excuse.
In other words, an individual cannot escape the criminal law simply because he sincerely but incorrectly believes that his acts are justified in the name of patriotism, or national security, or a need to create an unfavorable press image, or that his superiors had the authority without a warrant to suspend the Constitutional protections of the Fourth Amendment.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Barker and Martinez raise two arguments to sustain their position that they lacked the mens rea required for a conviction under section 241. The first is that their reasonable reliance on Hunt's authority -- their "mistake of fact mixed with law" -- negated the element of intent which is common to most serious criminal offenses, including conspiracy. It is this claim which requires reversal. Had the law as it stood in 1971 been correctly appraised by the trial judge, a more ample scope of proof and different jury instructions would have been granted appellants, all as discussed in Part IV, infra. The second argument is based upon the particular element of "specific intent" contained in section 241. While the court's opinion in Ehrlichman analyzes this second argument in detail,[FN7] a summary here may be helpful to distinguish the two arguments.

> FN7. United States v. Ehrlichman, No. 74-1822, 178 U.S.App.D.C. --, at pp. -- - --, 546 F.2d 910, at pp. 917-923.

III. THE "SPECIFIC INTENT" REQUIREMENT OF 18 U.S.C. s 241

[2] It is settled law that a conviction under this section requires proof that the offender acted with a "specific intent" to interfere with the federal rights in question.[FN8] This does not mean that he must have acted with the subjective awareness that his action was unlawful. It is enough that he intentionally performed acts which, under the circumstances of the case, would have been clearly in violation of federal law, absent any other defense.

> FN8. See, e. g., United States v. Guest, 383 U.S. 745, 753-54, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966).

[3] In the instant case, the District Court instructed the jury that a conviction was appropriate under section 241 if they found that the defendants conspired to enter and search Dr. Fielding's office, for governmental rather than personal reasons, without a warrant and without Dr. Fielding's permission. Barker and Martinez argue, however, citing United States v. Guest,[FN9] that the court erred in failing to advise the jury that a conviction was only possible if they further found that an unauthorized search of Dr. Fielding's office was the predominant, as opposed to incidental, purpose of the conspiracy. They conclude that such a test could not be met here, since their primary objective was the

inspection of Ellsberg's records, not the burglary of Dr. Fielding's office.

> FN9. 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966).

Admittedly, the Supreme Court's brief discussion in Guest of the "specific intent" requirement is susceptible of the interpretation the defendants would place upon it. The Court did use the words "predominant purpose" to characterize the kind of intent to interfere with the right of interstate travel which could trigger the application *946 **180 of section 241. [FN10] That such an interpretation of the "specific intent" requirement is incorrect, however, was made quite clear by the Supreme Court in its most recent major decision on the requirements of section 241, Anderson v. United States.[FN11] In that case, the primary objective of the conspiracy was to influence a local election by casting false votes. As an incidental matter, false votes were cast for candidates for federal office as well. The Court concluded that "specific intent" had been adequately proven:

> FN10. A specific intent to interfere with a federal right must be proved, and at trial the defendants are entitled to a jury instruction phrased in those terms. Thus, for example, a conspiracy to rob an interstate traveler would not, of itself, violate s 241. But if the predominant purpose of the conspiracy is to impede or prevent the exercise of the right of interstate travel or to oppress a person because of his exercise of that right, then, . . . the conspiracy becomes a proper object of the federal law under which the indictment in this case was brought.

Id. at 760, 86 S.Ct. at 1179.

> FN11. 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974).

A single conspiracy may have several purposes but if one of them whether primary or secondary be the violation of federal law, the conspiracy is unlawful under federal law.[FN12]

> FN12. Id. at 226, 94 S.Ct. at 2263.

Moreover, the Court emphasized, there was no requirement under section 241 that the defendants

have entertained the purpose of changing the outcome of the federal election. It was enough that they intended to cast false votes for candidates for federal office and thereby dilute the voting power of their fellow citizens.[FN13]

FN13. Id.

Thus, under Anderson, even if the defendants had as their primary objective the photographing of Daniel Ellsberg's medical file, so long as one of the purposes of the entry was to search Dr. Fielding's office without a warrant or his consent, the "specific intent" requirements of section 241 were met. Like that of Ehrlichman, the appeal of Barker and Martinez on this ground alone would falter.

IV. THE DEFENSE OF GOOD FAITH, REASONABLE RELIANCE ON APPARENT AUTHORITY

A.

The primary ground upon which defendants Barker and Martinez rest their appeal is the refusal of the District Court to allow them a defense based upon their good faith, reasonable reliance on Hunt's apparent authority. They characterize this defense as a mistake of fact "coupled with" a mistake of law which negated the mens rea required for a violation of section 241. "The mistake of fact was the belief that Hunt was a duly authorized government agent; the mistake of law was that Hunt possessed the legal prerequisites to conduct a search -- either probable cause or a warrant." [FN14]

FN14. Barker Br. at 31-32.

[4][5] It is a fundamental tenet of criminal law that an honest mistake of fact negatives criminal intent, when a defendant's acts would be lawful if the facts were as he supposed them to be.[FN15] A mistake of law, on the other hand, generally will not excuse the commission of an offense.[FN16] A defendant's error as to his authority to engage in particular activity, if based upon a mistaken view of legal requirements (or ignorance thereof), is a mistake of law. Typically, the fact that he relied upon the **\*947 \*\*181** erroneous advice of another is not an exculpatory circumstance. He is still deemed to have acted with a culpable state of mind.[FN17]

FN15. 1 Wharton's Criminal Law and Procedure s 157 (Cum.Supp.1974); Williams, Criminal Law: The General Part s 52-74 (2nd ed. 1961); Model Penal Code s 2.04(1) (P.O.D.1962). It is important to distinguish simple ignorance of fact from mistake of fact. Simple ignorance is generally not an excuse, because in such a situation the defendant cannot claim his action was lawful under the facts as he affirmatively believed them to be. See United States v. Barker, 168 U.S.App.D.C. 312, 371, 514 F.2d 208, 267 & n. 73 (1975) (Wilkey, J., dissenting); Williams, supra, at 151-56.

FN16. Wharton's, supra note 15, at s 162; Williams, supra note 15, at c. 8; Hall & Seligman, Mistake of Law and Mens Rea, 8 U.Chi.L.Rev. 641, 642 (1941).

FN17. See Perkins on Criminal Law 926-27 (2nd ed. 1969).

Thus at first blush the trial judge's rejection of the defense proffered by the defendants both in his pre-trial order and in his instruction to the jury seems legally sound. He advised the jury that if the defendants honestly believed a valid warrant had been obtained, this would constitute a mistake of fact which would render them innocent of a conspiracy to conduct a search in violation of the Fourth Amendment. If, in contrast, they simply believed, despite the absence of a warrant, that for reasons of national security or superior authority the break-in was legal, such a mistake of law would not excuse their acts.[FN18]

FN18. Tr. at 2525-26, note 6, supra.

B.

With all due deference to the trial judge, I must conclude that both charges were in fact incorrect, and that this error must be faced by the court on this appeal. The technical difficulty with the first instruction points up the deeper problem with the second.

[6][7] A governmental search and seizure is not rendered lawful under the Fourth Amendment by the simple fact that a warrant has been obtained. The

search is constitutionally proper only if the accompanying warrant is based upon legally sufficient probable cause. A factual mistake as to whether a warrant has been obtained, therefore, would not necessarily excuse an unlawful search because that search would not necessarily have been legal under the facts as the defendant believed them to be. As the District Court instructed the jury, only a mistake as to whether a valid warrant has been obtained would excuse the defendant's action, and that is a mistake of law. That the recipient of the warrant may have relied upon the opinion of a judge in determining that he had legally adequate probable cause to make a search does not, under traditional analysis, alter the situation. His mistake remains one of law, and, under a strict construction of the rule, will not excuse his unlawful act.

[8] It is readily apparent that few courts would countenance an instruction to a jury even assuming a criminal prosecution were brought against government agents in such a situation [FN19] which advised that since the mistake in acting on an invalid warrant was one of law, it would not excuse the agent's unlawful search. It is neither fair nor practical to hold such officials to a standard of care exceeding that exercised by a judge. Moreover, although the basic policy behind the mistake of law doctrine is that, at their peril, all men should know and obey the law,[FN20] in certain situations there is an overriding societal interest in having individuals rely on the authoritative pronouncements of officials whose decisions we wish to see respected.[FN21]

FN19. Police officers, receiving and acting on such defective warrants, are rarely prosecuted. See Model Penal Code s 2.04 (P.O.D.1962).

FN20. For a full discussion of the various rationales which have been forwarded to support the mistake of law doctrine, see United States v. Barker, 168 U.S.App.D.C. 312, 331-41, 514 F.2d 208, 227-37 (1975) (Bazelon, J., concurring).

FN21. See Hall & Seligman, supra note 16, at 675-83. In support of the general proposition that in compelling circumstances the law will not deny a defense to individuals who have mistakenly relied on the authority of a public official, see Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), Raley v. Ohio, 360 U.S.

423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959), and United States v. Mancuso, 139 F.2d 90 (3rd Cir. 1943). See also Perkins, supra note 17, at 926-27.

[9] For this reason, a number of exceptions to the mistake of law doctrine have developed where its application would be peculiarly unjust or counterproductive.[FN22] Their recognition in a particular case should give the defendant a defense similar to one based upon mistake of fact, I submit, with one important difference. His mistake should avail him only if it is objectively **948 **182 reasonable under the circumstances.[FN23] The mistake of a government agent in relying on a magistrate's approval of a search can be considered virtually per se reasonable. (The first instruction of the District Court, therefore, was incorrect only in characterizing a defense based upon the belief that a valid warrant had been obtained as one of fact, rather than as an exception to the mistake of law doctrine.[FN24] Similarly, if a private person is summoned by a police officer to assist in effecting an unlawful arrest, his reliance on the officer's authority to make the arrest may be considered reasonable as a matter of law. The citizen is under a legal obligation to respond to a proper summons and is in no position to second-guess the officer's determination that an arrest is proper. Indeed, it is society's hope in recognizing the reasonableness of a citizen's mistake in this situation to encourage unhesitating compliance with a police officer's call.[FN25]

FN22. See generally Williams, supra note 15, at 293-345.

FN23. In view of the strong public policy backing the mistake of law doctrine and the necessity for compelling justification to overcome it, it would appear rarely tenable to allow a defense based upon an irrational reliance on the authority of a public official. See Hall & Seligman, supra note 16, at 647. In contrast, although there is some authority to the effect that a mistake of fact must be reasonable to negate intent (Wharton's, supra note 15, at 382 n. 19), the better, and more widely held view is that even an unreasonable mistake of fact, if honest, constitutes a valid defense. Williams, supra note 15, at 201; Model Penal Code, Tentative Draft No. 4, at p. 136 (Commentary on s 2.04(1) (1953)).

FN24. The trial judge's error in this regard was certainly understandable. When the issue is one of reliance on authority, the distinction between law and fact becomes extremely difficult to discern. See United States v. Barker, 168 U.S.App.D.C. 312, 331-74, 514 F.2d 208, 227-70 (opinions of Bazelon, C. J., concurring, MacKinnon, dissenting, and Wilkey, dissenting). Indeed, that difficulty underscores the correctness of my position in this case that in situations where a citizen is innocently drawn into illegal action at the behest, and on the authority, of a government official, he should be allowed a defense of mistake of law based upon his reasonable reliance. If his mistake were labelled one of fact, it would provide a complete defense no matter how unreasonable the reliance. See note 23 supra.

FN25. This common law exception to the mistake of law doctrine is codified in section 3.07(4)(a) of the Model Penal Code, which states:

(a) A private person who is summoned by a peace officer to assist in effecting an unlawful arrest, is justified in using any force which he would be justified in using if the arrest were lawful, provided he does not believe the arrest is unlawful.

Other situations in which a government official enlists the aid of a private citizen to help him perform a governmental task are not so obviously reasonable on their face.[FN26] If the official does not order the citizen to assist him, but simply asks for such assistance, the citizen is not under a legal compulsion to comply.[FN27] Also, if the circumstances do not require immediate action, the citizen may have time to question the lawfulness of the planned endeavor. Nevertheless, the public policy of encouraging citizens to respond ungrudgingly to the request of officials for help in the performance of their duties remains quite strong. Moreover, the gap (both real and perceived) between a private citizen and a government official with regard to their ability and authority to judge the lawfulness of a particular*949 **183 governmental activity is great. It would appear to serve both justice and public policy in a situation where an individual acted at the behest of a government official to allow the individual a defense based upon his reliance on the official's authority if he can show that his reliance was objectively reasonable under the particular circumstances of his case.

FN26. See the discussion of People v. Weiss, 276 N.Y. 384, 12 N.E.2d 514 (1938), in the opinions of Chief Judge Bazelon, concurring, and Judges MacKinnon and Wilkey, dissenting, in United States v. Barker, 168 U.S.App.D.C. 312, 338-40, 346-47, 369-74, 514 F.2d 208, 234-36, 242-43, 265-70.

FN27. The Special Prosecutor argues in the instant case that since the defendants were not ordered to aid in the Fielding break-in, they can draw no support from the common law "call to aid" rule. He cites section 3.07(4)(b) of the Model Penal Code for the position that when one is "not summoned" but nevertheless aids a police officer in making an unlawful arrest, only a mistake of fact is a valid defense. It would appear, however, that a citizen who is "asked" or "entreated" to assist a police officer bears a heavy civic responsibility to comply. He is effectively, if not technically, "summoned." In such a situation, although we might hesitate to presume the reasonableness of his action as a matter of law, if the citizen can show that his mistake as to the officer's lawful authority was in fact reasonable under the circumstances, I submit he makes out a valid defense.

C.

This brings us to the District Court's second instruction to the jury. Although the defendants characterized their mistake as to Hunt's authority as one of fact, rather than law,[FN28] they requested an instruction which substantially coincides with my view of the proper test:

FN28. See note 24 supra.

(I)f you find that a defendant believed he was acting out of a good faith reliance upon the apparent authority of another to authorize his actions, that is a defense to the charge in Count 1, provided you find that such a mistake by a defendant was made honestly, sincerely, innocently and was a reasonable mistake to make based upon the facts as that defendant perceived them.[FN29]

546 F.2d 940, 178 U.S.App.D.C. 174
**(Cite as: 546 F.2d 940)**

FN29. Barker Appendix at 104-05.

The District Court refused this instruction, regardless whether denominated a mistake of fact or an exception to the doctrine of mistake of law, and advised the jury simply that a mistake as to the legality of an unlawful search was no excuse.[FN30]

FN30. Tr. 2525. See note 6 supra.

It is clear from the above discussion of the search innocently conducted under an invalid warrant that the court's instruction did not state the law, and that a mistake as to the legality of an unlawful search may sometimes be an excuse. The trial judge can justify such an instruction in this context only if there is no legal possibility of equating the reliance of Barker and Martinez on Hunt's apparent authority with the reliance of a police officer on a judicial warrant subsequently held invalid. And this will be true if and only if Barker and Martinez could not show both (1) facts justifying their reasonable reliance on Hunt's apparent authority and (2) a legal theory on which to base a reasonable belief that Hunt possessed such authority.

Barker and Martinez meet the test as to facts. There was abundant evidence in the case from which the jury could have found that the defendants honestly and reasonably believed they were engaged in a top-secret national security operation lawfully authorized by a government intelligence agency. They were enlisted for the break-in by a White House official, E. Howard Hunt, whom they knew as a long-time government agent with the CIA. They were told that the operation concerned national security involving "a traitor to this country who was passing . . . classified information to the Soviet Embassy." Further, their long experience with the CIA had taught the defendants the importance of complete reliance on, and obedience to, their supervisor. That they should be expected to operate on a "need-to-know" basis was neither unusual nor cause for inquiry.

Barker and Martinez likewise meet the test as to the legal theory on which Hunt could have possessed such authority. That the President had the authority to confer upon a group of aides in the White House "more authority than the FBI or CIA," was in 1971 and is now by no means inconceivable as a matter of law. I certainly do not assert that the President here actually did so act (see the court's opinion in Ehrlichman ), nor do we in this case need to decide the question of Executive authority to conduct warrantless searches pertaining to foreign agents, which issue was left open by the Supreme Court in United States v. United States District Court (Keith).[FN31]

FN31. 407 U.S. 297, 321-22, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). Barker and Martinez do not allege that they thought the President personally had authorized the operation, nor does the issue arise here as it does in Ehrlichman. Laymen Barker and Martinez would not be expected to have cognizance of the forty years' practice whereby foreign affairs surveillances were authorized without a warrant either by the Attorney General or President. Their justification is a reasonable mistake of law, and in their position and known facts a reasonable mistake of law involves a mistake as to Hunt's authority, not that of the Attorney General or President.

**\*950 \*\*184** What is so evident from the trial court's instructions and his previous legal memorandum, and likewise in the concurring statement of my colleague Judge Leventhal in Ehrlichman, is that neither the trial judge nor Judge Leventhal agree with the theory that the Chief Executive acting personally has a constitutionally conferred power, where the objects of investigation are agents or collaborators with a foreign nation, to authorize a visual or auditory search and seizure of materials bearing on the suspected betrayal of defense secrets, without securing a judicial warrant in short, that in this very carefully defined area,[FN32] there does exist a constitutional Chief Executive warrant. They may be right. But that is not the issue here for Barker and Martinez. The issue is whether, given undisputed facts as known and represented to them, it was reasonable in 1971 for Barker and Martinez to act on the assumption that authority had been validly conferred on their immediate superior. The trial judge and my colleague have been unable to restrain themselves from inferentially deciding the issue deliberately left open by the Supreme Court in Keith in 1972, and having done so then proceed to tax Barker and Martinez with a failure to have acted on their unestablished rationale in 1971.

FN32. See Zweibon v. Mitchell, 170 U.S.App.D.C. 1, 96, 516 F.2d 594, 689 (1975) (en banc) (Wilkey, J., dissenting),

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

546 F.2d 940, 178 U.S.App.D.C. 174
**(Cite as: 546 F.2d 940)**

cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (1976).

That the President would have such power under the Constitution is and has always been the clear position of the Executive Branch. Significantly, the present Attorney General only recently commented on Keith to this effect: "In United States v. United States District Court, while holding that the warrant requirement of the Fourth Amendment applied in the domestic field, the Court expressly stated that 'the instant case requires no judgment with respect to the activities of foreign powers, within or without this country.' (Emphasis the Attorney General's.) It is not without significance that the words of the Court focus on the subject matter of the surveillance, rather than on the physical location where it is conducted." [FN33] No court has yet ruled that the President lacks this prerogative in a case involving wiretapping of foreign agents or collaborators with a foreign power.[FN34]

FN33. The Record of the Association of the Bar of the City of New York, Vol. 30, p. 331 (May-June 1975).

FN34. United States v. Butenko, 494 F.2d 593 (3rd Cir. 1974), cert. denied, Ivanov v. United States, 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974). United States v. Brown, 484 F.2d 418 (5th Cir. 1973). Cf. Zweibon v. Mitchell, 170 U.S.App.D.C. 1, 516 F.2d 594 (1975) cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (1976) (distinctly non-collaborators with the Soviet Union were the objects of electronic surveillance).

In the instant case, the Department of Justice, while supporting the Special Prosecutor on other issues, within the limits of a 300-word Memorandum, took the pains to state:
In regard to warrantless searches related to foreign espionage or intelligence, the Department does not believe there is a constitutional difference between searches conducted by wiretapping and those involving physical entries into private premises. One form of search is no less serious than another. It is and has long been the Department's view that warrantless searches involving physical entries into private premises are justified under the proper circumstances when related to foreign espionage or intelligence (See U.S. Brief p. 45, n. 39).[FN35]

FN35. Memorandum for the United States as Amicus Curiae, p. 2.

Finally, on 19 February 1976, the Attorney General announced his decision, on the recommendation of the Deputy Attorney *951 **185 General and the head of the Civil Rights Division, not to prosecute former CIA Director Richard Helms for his personally authorizing a 1971 break-in at a photographic studio as part of a national security violation investigation.[FN36] Helms, like the present defendants, was involved in a 1971 break-in to conduct a visual search for evidence of national security violations. The positions of both Helms and the present appellants rest upon good faith belief that their warrantless physical intrusions were legally authorized. Helms' belief, which led the Justice Department to decline prosecution, was that a statute authorized him to ignore the commandments of the Fourth Amendment. Barker's and Martinez's belief was that there was authorization within the White House for this intrusion relating to national security a legal theory which, if valid, would be of constitutional rather than merely statutory dimensions. Though both were mistakes of law, appellants' view thus appears to be supported by sounder legal theory than that of Helms, who seems to assert that a statute can excuse constitutional compliance. Yet even in the case of Helms, the Attorney General concluded that any prosecution for the physical search would be inappropriate.

FN36. The Department of Justice announcement said:
The Department of Justice will not prosecute former CIA Director Richard Helms and others for their role in a 1971 break-in at a photographic studio in Fairfax City, Virginia, Attorney General Edward H. Levi announced today.
The Department's investigation involved the surreptitious entry by CIA agents and Fairfax City police into a photographic studio on February 19, 1971.
The Federal statute under which prosecution was considered is Section 242 of Title 18, United States Code.
The leading case interpreting that statute, Screws v. United States, 325 U.S. 91, 104, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), requires proof that the accused willfully deprived an individual of a specific and well-defined constitutional right.
After studying the facts carefully and interrogating

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the witnesses at length, the Department concluded that the evidence did not meet the standard set by the Screws case to establish a criminal violation of the statute.

The written announcement was amplified, according to The Washington Post of 20 February 1976, pp. A1 and A6, as follows:

Justice Department sources said that Helms clearly thought he had the authority to approve a break-in and did so to complete a security investigation. . . .

"It was impossible to prove he (Helms) had intent to violate anyone's civil rights," one Justice Department source said. . . .

The 1947 law setting up the CIA says, "The Director of central intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure."

Under this law Justice Department attorneys said they felt Helms could reasonably argue the protection required extraordinary means.

Mr. Helms' counsel is reported as commenting, "If the government has a right to conduct electronic surveillance, then it has a right to make surreptitious entry." The Washington Post, 20 February 1976, at A1.

Naturally I share my colleague's distaste for the necessity to rely upon an Executive Department's press release or a newspaper article related thereto. Where prosecution is declined, however, by definition no paper is ever filed in a court. An official written announcement of the Department of Justice, giving a terse summary of the legal rationale supporting the decision, is more than is usually available and all that can ever be expected.

The trial court rejected the pleas of appellants Barker and Martinez that they should have been allowed a defense on proof of reasonable, though mistaken, belief that their actions were duly authorized by an organization "at the White House level . . . above the FBI and the CIA." Either the Attorney General was wrong on 19 February 1976 when he declined prosecution of Director Helms, or the trial judge here was wrong when he barred the evidence and jury instruction which might have acquitted Barker and Martinez. I believe, as set forth in the previous nineteen pages, that the trial judge was wrong and the Attorney General right. But even if I am in error on this, of one thing I am certain: In 1971 there was not in the United States of America one Fourth Amendment for Richard Helms and another for Bernard Barker and Eugenio Martinez.

As to the reasonableness of the legal theory on which Barker's and Martinez's actions rest, they thus have at

least the position **\*952 \*\*186** of the Attorney General behind them. This is not to hold here that the position is correct, but surely two laymen cannot be faulted for acting on a known and represented fact situation and in accordance with a legal theory espoused by this and all past Attorneys General for forty years. It is in implicit recognition of this that Judge Leventhal feels obliged to attempt to undermine the theory on the merits [FN37] by trying to distinguish between wiretapping and physical entry; according to Judge Leventhal, the first perhaps constitutionally granted to the President, the second never.[FN38]

> FN37. Albeit Judge Leventhal makes his statement in Ehrlichman, where the issue of apparent approval by a higher authority does not arise. No one represented to Ehrlichman that he was acting on higher authority for Ehrlichman was higher authority in that case. See court's opinion in Ehrlichman, No. 74-1882, 178 U.S.App.D.C. --, at p. --, 546 F.2d 910 at p. 923.

With regard to the comparative positions of the offices of the Attorney General and the Special Prosecutor, and with all due respect to the public service this special task force has rendered in a time of crisis, it is a special task force created in 1973 which will shortly disband and close its files. The Attorney General has been with us since President Washington's first cabinet meeting in 1789, and is not about to go out of business. The Attorney General, then, represents a long perspective of what our legal problems in this most delicate area of national security and constitutional principles have been for 200 years and are likely to be in the future. That perspective of the Attorney General is deepened by the vast accumulated experience reposing in the personnel and files of the Department of Justice, heightened by the close personal relationship between President and Attorney General at some periods of our history, and sharpened by the current awareness of the present Attorney General as to what great problems in this area loom in the immediate future. In evaluating the conflicting views of the two offices, these factors surely must be placed in the balance by any court ultimately applying constitutional principles to national security problems.

> FN38. Judge Leventhal asserts 178 U.S.App.D.C. p. --, 546 F.2d p. 937 "(t) here may well be a critical difference between electronic surveillance and physical entries for the purpose of search and seizure . . .,"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and approves the Special Prosecutor's stress on certain language in Keith. The partially quoted thought from the Supreme Court complete is, "Though physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed, its broader spirit now shields private speech from unreasonable surveillance. (Citing Katz, Berger, and Silverman ) Our decision in Katz refused to lock the Fourth Amendment into instances of actual physical trespass." 407 U.S. at 313, 92 S.Ct. at 2134 (emphasis supplied).

I cannot agree that Justice Powell's language, specifically cited by Judge Leventhal and the Special Prosecutor to prove a constitutional difference "between electronic surveillance and physical entries," supports the difference at all. I respectfully suggest the opposite meaning is conveyed, i. e., physical and electronic entry stand on the same footing, good or bad. And that is all that it is necessary to understand to validate Barker's and Martinez's argument that they lacked the requisite criminal intent in 1971, given the state of Fourth Amendment law then and now.

Since the issue here is not the correctness of the legal theory, but the reasonableness in 1971 of acting consonant with it, and since the Department of Justice addressed the issue to this court in only one paragraph, a brief reply to Judge Leventhal may suffice: (1) a physical trespass is usually necessary to install a wiretap, whether the tap is authorized by the Judiciary or the Executive; (2) such physical trespasses have repeatedly been authorized by judges, Presidents, and Attorneys General; (3) they will continue to be so authorized until the Supreme Court rules otherwise; (4) what is the constitutional difference between a physical entry (Presidentially authorized) for the purpose of an auditory search (wiretap) and a physical entry (Presidentially authorized) for the purpose of a visual search (photographing documents)? What is the constitutionally relevant distinction between surreptitiously listening to (or recording) a citizen's spoken words and looking at (or photographing) his written words? (5) If there is no difference, then when the Supreme Court reserved the question of wiretapping (auditory searches) in Keith, did it not also logically and necessarily reserve the same issue in regard to visual searches?

We all know that physical entry for the purpose of auditory search has been authorized by President and Attorney General **953 **187 for forty years in national security related cases. It is the constitutional validity of this which the Supreme Court has never voided but specifically reserved in Keith. We all know (or suspect) that physical entry for the purpose of visual search has been authorized by President and Attorney General for many years in national security related cases. It is the constitutional validity of this which the Attorney General reserved in one paragraph of his two-page memorandum in this case, but which has never reached the Supreme Court. Unpermitted physical entry into a citizen's dwelling is no doubt the core of the Fourth Amendment prohibition against unreasonable searches and seizures,[FN39] but physical entry for an auditory or visual search may stand on the same footing, whether constitutionally firm or infirm.[FN40]

> FN39. It can be readily agreed that the framers of the Fourth Amendment were primarily concerned with physical intrusions by governmental officials into the sanctity of the home. It is extremely doubtful, however, that this tells us anything about how they would have regarded electronic intrusions. Not being blessed with the telephone, they never considered the problem of wiretaps. A good argument can be made that electronic, "non-trespassory" searches are more intrusive than their "trespassory" counterparts. United States v. Smith, 321 F.Supp. 424 (D.D.C.Cal.1971), reasoned:
>
> (E)lectronic surveillance is perhaps the most objectionable of all types of searches in light of the intention of the Fourth Amendment. It is carried out against an unsuspecting individual in a dragnet fashion, taking in all of his conversations whether or not they are relevant to the purposes of the investigation and continuing over a considerable length of time. If the government's "reasonableness" rationale is accepted in this case, then it would apply a fortiori to other types of searches. Since they are more limited in time, place and manner, they would be even more "reasonable."
> Id. at 429.

> FN40. The only possible rationale for distinguishing electronic information gathering from physical searches is that, in the District Court's words, the former is "less intrusive" than the latter. Exactly why this might be so is not explained in Judge Leventhal's opinion. See note 38 supra. The Special Prosecutor, however, defends the distinction by repeatedly emphasizing in his

brief that a wiretap is non-trespassory. He suggests that if the Government must effect a trespass in order to place wiretapping or bugging equipment and certainly if a trespass is made in order to photograph documents then immunity from the warrant requirement in cases related to foreign affairs is lost.

The Special Prosecutor cites no authority in direct support of this proposition. He relies essentially on an absence of discussion of the question to create a heretofore unsuggested distinction. Neither logic, history, nor case law, however, provides an adequate basis for this artificial differentiation.

From a logical standpoint, if a President has the authority pursuant to his foreign affairs power to approve surveillance activities, it would appear that his prerogative is no different from that of a court reviewing a warrant request in a more mundane criminal setting. If there is a "national security" exemption (which neither the Supreme Court in Keith nor this court in Zweibon ruled out), the task of determining whether such a search is justified falls to the Executive, rather than to the courts. All the elements of speed, secrecy, and Executive expertise which support vesting this power in the President where wiretapping (whether "trespassory" or "non-trespassory") is involved also apply where a photographic search is in question. Court-ordered surveillances are sometimes trespassory, sometimes not, depending on the requirements of the situation, and so are Executive surveillances in the foreign affairs field.

The record in a recent case in this court provides documentation of judicial authorization for government agents to "Intercept wire communications (etc. and to) Install and maintain an electronic eavesdropping device within the (room of a building at a specific address) to intercept (certain specified) oral communications . . . concerning (certain) described offenses. Installation of the above described eavesdropping device may be accomplished by any reasonable means, including surreptitious entry or entry by ruse." United States v. Barker, 168 U.S.App.D.C. 312, 345-46, 514 F.2d 208, 241-42 (1974) (MacKinnon, J., dissenting). Of course, if a trespass is not necessary in a particular case to effect an eavesdrop, the court need not gratuitously authorize a surreptitious entry; but few would question a court's power to do so in those cases in which it is required.

That auditory and visual searches and physical entry to effect them stand on the same footing, is what the Department of Justice memorandum maintained. It also stated that both are valid in the strictly limited espionage and intelligence area. After Katz [FN41] in 1967 ruled out completely **954 **188 the patently untenable distinction between trespassory and non-trespassory wiretaps and held that the application of the Fourth Amendment could not turn on the presence or absence of a physical intrusion, it would appear arguable that physical entry for either an auditory or visual search for material related to an agent or collaborator with a foreign nation, if authorized by the President or Attorney General, would be valid under the Executive's constitutional foreign affairs powers.

FN41. United States v. Katz, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

This court need not pass and does not pass on the correctness of the Attorney General's position. I do think that defendants Barker and Martinez were entitled to act in objective good faith on the facts known to them in regard to Hunt's position and implicitly on the validity of a legal theory, still to be disproved, which has been vigorously espoused by President and Attorney General for the last forty years. I think it plain that a citizen should have a legal defense to a criminal charge arising out of an unlawful arrest or search which he has aided in the reasonable belief that the individual who solicited his assistance was a duly authorized officer of the law. It was error for the trial court to bar this defense in the admission of evidence and instructions to the jury, and the convictions must accordingly be

Reversed.

MERHIGE, District Judge:
While I generally concur with the positions taken by my Brothers with respect to the "specific intent" requirement of 18 U.S.C. s 241, I am not, despite my concurrence with the results reached by Judge Wilkey, willing to fully subscribe to the views expressed by him in his analysis of the mistake of law issue. Our differences arise from my inability to acquiesce in the broad framework inherent in his analysis. My views in this regard follow:

Defendants Barker and Martinez rest their appeal on the district court's refusal to instruct the jury that a "good faith reliance upon the apparent authority of another to authorize (their) actions" is a defense to the charge of conspiracy under Title 18 U.S.C. s 241. The district judge advised the jury that a mistake of law is no excuse, and, therefore, that a mistake as to

546 F.2d 940                                                                                             Page 15
546 F.2d 940, 178 U.S.App.D.C. 174
**(Cite as: 546 F.2d 940)**

the legality of the search in issue was not a defense to the charges contained in the indictment. In that regard, the district judge was applying the general rule on mistake of law that has long been an integral part of our system of jurisprudence. See, e. g., Lambert v. California, 355 U.S. 225, 228, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957) quoting Shevlin-Carpenter Company v. Minnesota, 218 U.S. 57, 68, 30 S.Ct. 663, 54 L.Ed. 930 (1910). See generally Hall & Seligman, Mistake of Law and Mens Rea, 8 University of Chicago Law Review 641 (1941); Keedy, Ignorance and Mistake in the Criminal Law, 22 Harv.L.Rev. 75 (1908); Perkins, Ignorance and Mistake in Criminal Law, 88 Univ. of Pa.L.Rev. 35 (1939). The most commonly asserted rationale for the continuing vitality of the rule is that its absence would encourage and reward public ignorance of the law to the detriment of our organized legal system, and would encourage universal pleas of ignorance of the law that would constantly pose confusing and, to a great extent, insolvable issues of fact to juries and judges, thereby bogging down our adjudicative system. See United States v. Barker, 168 U.S.App.D.C. 312, 514 F.2d 208, 230-32 (1975, Bazelon, Chief Judge concurring), Hall & Seligman, supra at 646-51. The harshness of the rule on the individual case is responded to by either or both of two thesis: individual justice and equity is outweighed by the larger social interest of maintaining a public knowledge about the law so as to discourage and deter "illegal" acts; and, as discussed by Judge Leventhal in his view of this case, the rule is subject to mitigation by virtue of prosecutorial discretion, judicial sentencing, executive clemency, and/or jury nullification.[FN1] E. g., Perkins, supra at 41.

> FN1. This Circuit has held that jury instructions on nullification are improper. United States v. Dougherty, 154 U.S.App.D.C. 76, 473 F.2d 1113 (1972). The Court acknowledges, however, that a jury still may acquit in disregard of the instructions on the law given by the trial judge. Id. at 1132.

**\*955 \*\*189** Exceptions to the rule, however, have developed in situations where its policy foundations have failed to apply with strength, and alternative policy consideration strongly favor a different result. The exceptions have been both statutory, e. g., Act of August 22, 1940, s 49, 15 U.S.C. s 80a-48; Public Utility Holding Company Act of 1935, s 29, 15 U.S.C. s 79z-3, and judicial. E.g., United States v.

Mancuso, 139 F.2d 90 (3d Cir. 1943); Moyer v. Meier, 205 Okl. 405, 238 P.2d 338 (1951); Anno., 29 A.L.R.2d 825 (1953). See also Model Penal Code ss 2.05(3), 3.07(4)(a). The instant case fits the pattern of a set of circumstances that has been recognized by some, and that in my view should be endorsed by this Court as an exception to the general rule. Defendants Barker and Martinez contend that they were affirmatively misled by an official interpretation of the relevant law, and are entitled to an instruction to that effect, permitting the jury to assess the reasonableness and sincerity of their alleged reliance.

The Model Penal Code states the defense as follows: A belief that conduct does not legally constitute an offense is a defense to a prosecution for that offense based upon such conduct when: . . . (b) he acts in reasonable reliance upon an official statement of the law, afterward determined to be invalid or erroneous, contained in (i) a statute or other enactment; (ii) a judicial decision, opinion or judgment; (iii) an administrative order or grant of permission; or (iv) an official interpretation of the public officer or body charged by law with responsibility for the interpretation, administration or enforcement of the law defining the offense. s 2.04(3)(b).

See also Proposed New Federal Criminal Code, Final Report of a National Commission on Reform of Federal Criminal Laws s 610 (1971). The rationale of the section is well illustrated by the case of United States v. Mancuso, 139 F.2d 90 (3d Cir. 1943). The legal issue therein was whether a defendant could be punished for failure to obey an order made by a local draft board when its issuing of such an order to the defendant was interdicted by a judicial decree which was itself, erroneous and subject to reversal. The court in that case stated:We think the defendant cannot be convicted for failing to obey an order, issuance of which is forbidden by the court's injunction. While it is true that men are, in general, held responsible for violations of the law, whether they know it or not, we do not think the layman participating in a lawsuit is required to know more than the judge. 139 F.2d at 92. (Footnote omitted)

The introduction of an "official" source for an individual's reliance on a mistaken concept of the law in acting "illegally" significantly diminishes the strength of the policy foundations supporting the general rule on mistake of law, and adds policy considerations of grave import that would favor an apposite result. In my view, the defense is available if, and only if, an individual (1) reasonably, on the basis of an objective standard, (2) relies on a (3)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conclusion or statement of law (4) issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field. The first three issues are of course of a factual nature that may be submitted to a jury; the fourth is a question of law as it deals with interpretations of the parameters of legal authority.

Exoneration of an individual reasonably relying on an official's statement of the law would not serve to encourage public ignorance of law, for the defense requires that the individual either seek out or be cognizant of the official statement upon which he or she relies. Some knowledge of the law, verified by an independent and typically competent source, is required. Furthermore, pleas of ignorance of the law will neither be so universal nor so abnormally *956 **190 confusing to the fact-finder as to discompose the judicial process. The defense is precisely limited to be consistent with its policies, and it involves issues no more complex than those decided on a routine basis in other matters.

Furthermore, the defense advances the policy of fostering obedience to the decisions of certain individuals and groups of individuals that society has put in positions of prominence in the governing structure i. e., courts, executive officials and legislative bodies. While the policy is unquestionably strongest when applied to those bodies that apply or make law with the most apparent finality, i. e., legislatures and the courts, it has application as well to those in official positions that "interpret" the law in a largely advisory capacity, i. e., opinions of the United States Attorney General. The reasonableness of the reliance may dissipate if one depends on nonenforceable advisory opinions of minor officials however. The policy is limited by the actual existence of an appropriate "official(s)" and does not support an abrogation of the policies behind the general mistake of law rule if an individual places his or her reliance, though reasonable, in a stranger to public office erroneously believing him to be an official.[FN2] Similarly, the defense does not extend to reliance on individuals, who although employed in a public capacity, have no interpretative or administrative responsibilities in the area associated with the legal concepts involved in the mistaken opinion or decision.

FN2. Similarly, the defense of mistake of law historically gave a private person when he responds to a request by a police officer to aid in making an arrest and the arrest

proves ultimately to have been unlawful, is limited by the requirement that the party aided has the authority to make the arrest. E. g., Dietrichs v. Schaw, 43 Ind. 175 (1873); Moyer v. Meier, 205 Okl. 405, 238 P.2d 338, 340 (1951).

The defense has been most commonly accepted when an individual acts in reliance on a statute later held to be unconstitutional,[FN3] or on an express decision of unconstitutionality of a statute by a competent court of general jurisdiction that is subsequently overruled.[FN4] Most jurisdictions will not permit a defense based on reliance upon the advice of counsel.[FN5] The defense, however, is not limited to those which have been most commonly accepted as I have heretofore made reference. It has been extended to cases of reliance on official advisory opinions. In State v. Davis, 63 Wisc.2d 75, 216 N.W.2d 31 (1974), the defendant was exonerated on the basis of a reliance on erroneous advice of a county corporation counsel and assistant district attorney. In People v. Ferguson, 134 Cal. 41, 24 P.2d 965 (1933), reliance on the advice of the state corporation commissioner and deputy commissioners was held to excuse a violation of the state's blue sky laws. See also Texas Co. v. State., 31 Ariz. 485, 254 P. 1060 (1927); State v. White, 237 Mo. 208, 140 S.W. 896 (1911); State v. Pearson, 97 N.C. 434, 1 S.E. 914 (1887). But see U. S. v. Mansavage, 178 F.2d 812 (7th Cir. 1949); Hopkins v. State, 193 Md. 489, 69 A.2d 456 (1949); Staley v. State, 89 Neb. 701, 131 N.W. 1028 (1911); State v. Foster, 22 R.I. 163, 46 A. 833 (1900).

FN3. E. g., Claybrook v. State, 164 Tenn. 440, 51 S.W.2d 499 (1932); State v. Godwin, 123 N.C. 697, 31 S.E. 221 (1898). But see Dupree v. State, 184 Ark. 1120, 44 S.W.2d 1097 (1932).

FN4. E. g., United States v. Mancuso, 139 F.2d 90 (3d Cir. 1943); State v. O'Neil, 147 Iowa 513, 126 N.W. 454 (1910); State v. Chicago, M. & St. P. Ry. Co., 130 Minn. 144, 153 N.W. 320 (1915); State v. Longino, 109 Miss. 125, 67 So. 902 (1915); State v. Jones, 44 N.M. 623, 107 P.2d 324 (1940). But see Hoover v. State, 59 Ala. 57 (1877).

FN5. E. g., Staley v. State, 89 Neb. 701, 131 N.W. 1028 (1911); State v. Whiteaker, 118 Ore. 656, 247 P. 1077 (1926).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

546 F.2d 940, 178 U.S.App.D.C. 174
**(Cite as: 546 F.2d 940)**

Arguments against extending the defense to reliance on the advice of government officials take a form of the following proposition: Minor government officials will have the ability to effectively "immunize" individuals from prosecution. In response, it must be noted that with respect to a particular statement, a government official is himself culpable if he knowingly mistakes the law. Hence he may proffer mistaken advice without retribution only until he discovers**957 ****191** its invalidity. To argue further, that incompetent or dishonest minor officials may exist in numbers serious enough to question reliance on their decisions or interpretations, inherently characterizes those public servants upon whom we must depend for the ultimate success of the operation of our government, as suspect. I for one, am not willing to assume that the incidence of incompetent, insensitive or dishonest public officials is significant enough to dispute the premise that in general, public officials merit the respect of the public. Furthermore, our citizenry are not so naive as not to recognize that all of our institutions are susceptible of being made up of both savory and unsavory individuals.

Still some will have cause to be concerned about the extent of the exception to the general rule. Judge Leventhal notes that "(t)he potentially broad range of illegal activities that a government official might request a private citizen to do, would make it impossible to rely on the educational value that normally inheres when a mistake of law is recognized as an excuse in one case that serves to define them all for similarly circumstanced defenders in the future." The argument is one of great appeal. Nevertheless, it smacks of a distrust of public officials yet to so categorize it may be unfair. In essence, it asserts that since there exists a large number of public officials who may well be asked to advise or decide on a myriad of legal problems, that many mistaken judgments may be advanced, and members of the public should be required before acting in accordance therewith to examine those interpretations at their peril. The argument, assuming as I do that it is not directed at corrupt officials, requires the individual citizen to be more cognizant of and have a better understanding of the law than a public official who is responsible for and specifically employed to make interpretations of the law in the relevant legal field. Such a burden is, in my view, unreasonable. Finally, it should be noted that the strength of the arguments premised upon the potential extent of the defense is mitigated by the requirement of objective reasonableness. If a public official's opinion of the law is fairly outrageous, the jury may conclude that a

reasonable man would take appropriate steps to verify it prior to reliance thereon.

Applying the defense to the facts of this case, the record discloses sufficient evidence of reliance on an official interpretation of the law for the matter to have been submitted to the jury. Barker and Martinez assert that they relied on Hunt's authority as delegated from an intelligence superstructure controlled by the White House, and firmly believed that they were acting in a legal capacity. The Executive Branch of the United States Government is vested with substantive responsibilities in the field of national security, and decisions of its officials on the extent of their legal authority deserve some deference from the public.[FN6] A jury may well find that John Ehrlichman, then Assistant to the President for Domestic Affairs, expressed or implied that the break-in of Dr. Fielding's office was legal under a national security rationale, and that Hunt, as an executive official in a go-between capacity, passed the position on to the defendants, which they, acting as reasonable men, relied upon in performing the break-in.[FN7]

> FN6. This is not to say that I concur in the view of the Attorney General that there is a "national security" exception permitting physical intrusion in a citizen's home or office on specific approval of the President or Attorney General, even in the absence of a valid warrant. That issue is not before us.

> FN7. See Footnotes 4 and 5 in Judge Leventhal's opinion.

Accordingly, while I concur with Judge Wilkey that the jury should have been instructed on a limited mistake of law defense, I believe any such instruction should, in the event of a retrial be couched consistent with the views herein expressed.

LEVENTHAL, Circuit Judge (dissenting):
This opinion considers the appeals of Bernard L. Barker and Eugenio R. Martinez, **958 ****192** who were convicted of conspiracy in violation of 18 U.S.C. s 241, and sentenced to three years probation. They were charged, along with co-defendants John D. Ehrlichman and G. Gordon Liddy, with conspiracy to enter without lawful authority the offices of Dr. Lewis J. Fielding on September 3, 1971, in order to search for confidential information concerning his patient, Daniel Ellsberg, thereby injuring Dr. Fielding in his Fourth Amendment right

546 F.2d 940                                                                                    Page 18
546 F.2d 940, 178 U.S.App.D.C. 174
**(Cite as: 546 F.2d 940)**

to be secure against unreasonable searches and seizures.

Barker and Martinez present considerations and issues that differ in some respects from those discussed in the opinions issued today in the cases of Ehrlichman and Liddy. I would reach the same result, of affirmance. Whatever equities may pertain to the case of these defendants of Cuban origin, who claim that their actions reflect their patriotism, were taken into account when the trial judge limited their sentence to a modest probation. Their quest for complete exculpation does not entitle them, in my view, to a ruling that the trial judge was mistaken as to the pertinent principles of law.[FN1]

> FN1. Defendants also contend that the district court erred in failing to dismiss the indictment for grand jury improprieties; in failing to correct for prejudicial publicity; and in failing to give a jury nullification charge. The grand jury point is dealt with in note 58, infra. Their claims of error in refusing to dismiss the indictment or order a continuance or change of venue on prejudicial pretrial publicity grounds should be rejected for the reasons set forth in United States v. Ehrlichman, decided this day, at note 8. A right to a jury nullification charge was rejected by this court in United States v. Dougherty, 154 U.S.App.D.C. 76, 93-100, 473 F.2d 1113, 1130-1137 (1972), and that decision controls defendants' claim as well.

My opinion explaining why I dissent from the reversals contemplated by Judges Wilkey and Merhige, is cast in the conventional form of opinions that present first a statement of facts, then an orderly discussion of the legal principles more or less seriatim. This case also calls, I think, for an opening exclamation of puzzlement and wonder. Is this judicial novelty, a bold injection of mistake of law as a valid defense to criminal liability, really being wrought in a case where defendants are charged with combining to violate civil and constitutional rights? Can this extension be justified where there was a deliberate forcible entry, indeed a burglary, into the office of a doctor who was in no way suspected of any illegality or even impropriety, with the force compounded by subterfuge, dark of night, and the derring-do of "salting" the office with nuggets to create suspicion that the deed was done by addicts looking for narcotics?

Judge Wilkey begins to cast his spell by describing Barker and Martinez as "footsoldiers" here in court again. Of course, they are here this time for an offense that took place the year before the notorious 1972 Watergate entry that led them to enter pleas of guilty to burglary. Every violation of civil rights depends not only on those who initiate, often unhappily with an official orientation of sorts, but also on those whose active effort is necessary to bring the project to fruition. To the extent appellants are deemed worthy of sympathy, that has been provided by the probation. To give them not only sympathy but exoneration, and absolution, is to stand the law upside down, in my view, and to sack legal principle instead of relying on the elements of humane administration that are available to buffer any grinding edge of law. That this tolerance of unlawful official action is a defense available for selective undermining of civil rights laws leads me to shake my head both in wonder and despair.

## I. FACTUAL BACKGROUND

Barker and Martinez are both American citizens.[FN2] They fled Cuba for Miami, Florida, after Fidel Castro came to power. Both Barker and Martinez have been covert agents for the Central Intelligence Agency. Martinez worked for the CIA from 1959 until 1972, and was involved in infiltrating Cuba and supplying arms and ammunition to Cuba from a United States base. Barker **\*959 \*\*193** worked undercover in Cuba before his arrival in Miami in 1960. He was terminated in 1966. During their CIA employment both Barker and Martinez were involved with the Bay of Pigs operation, and Barker's immediate superior for that venture was E. Howard Hunt, known as "Eduardo" in Miami's Cuban-American Community.

> FN2. Barker was an American citizen by birth, lost his citizenship while living in Cuba, but reacquired it. (Tr. 2187). Martinez became a naturalized citizen in July 1970 (Tr. 2149).

Hunt, along with Egil Krogh, David Young and G. Gordon Liddy, composed the White House "Room 16" Unit. The unit was established under the supervision of John Ehrlichman, then Assistant to the President for Domestic Affairs, to investigate and stop leaks of classified information. Publication of the "Pentagon Papers" was the catalyst for the Room

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

546 F.2d 940
546 F.2d 940, 178 U.S.App.D.C. 174
**(Cite as: 546 F.2d 940)**

16 unit's formation, and obtaining information on the source of that famous leak Daniel Ellsberg became the unit's primary concern. After Ellsberg's psychiatrist, Dr. Fielding, refused to be interviewed by FBI agents, the unit decided to obtain copies of Ellsberg's medical records by a surreptitious entry of Dr. Fielding's office.

To avoid White House employee involvement in the actual search, Hunt recruited Barker, and through Barker, Martinez and Felipe De Diego.[FN3] Barker testified (Tr. 2197ff) that Hunt said he was in an "organization that had been created in the White House level this organization he described as a sort of superstructure that was above the FBI and the CIA" and "had been formed because the FBI was tied by Supreme Court decisions . . . and the Central Intelligence Agency didn't have jurisdiction in certain matters." He spoke of "some kind of upheaval in the intelligence community in Washington" and asked if Barker would like to become operational again, which Barker termed a "very happy thing to us."

> FN3. Although De Diego was indicted under s 241 along with the other defendants, the District Court on May 22, 1974, ordered the indictment as to De Diego dismissed with prejudice on the ground that the Government could not meet its burden of showing that its case was not tainted by the use of immunized testimony. This court reversed that order. United States v. De Diego, 167 U.S.App.D.C. 252, 511 F.2d 818 (1975). The Special Prosecutor, however, subsequently elected not to pursue the prosecution.

While conducting these negotiations, Hunt represented himself accurately as working in the White House.[FN4] We may assume for present purposes that a jury might reasonably find that Barker and Martinez did, as they later put it, believe or assume that Hunt was a "CIA man" in the White House, notwithstanding contrary indications.[FN5] Martinez was aware that his participation in the plan might have been illegal for a "normal citizen." (Tr. 2170).

> FN4. Barker visited and telephoned Hunt in his Executive Office Building office, and also received letters from Hunt on White House stationery, all serving to corroborate Hunt's employment.

> FN5. The Barker-Martinez brief notes (p. 12) that with respect to Martinez's reporting "Eduardo's" visit to Miami to his CIA case officer, "(t)he failure of his case officer to respond on the first occasion was significant to Martinez because normally when he reported the presence of someone associated with the CIA in Miami he was told whether the person's name was cleared. (M., Tr. 2157-58). On the second occasion the case officer's denial that 'Eduardo' was in the White House, something which Martinez knew to be a fact, led Martinez to conclude that his case officer either was not supposed to know about Hunt or that his case officer did not want to convey Hunt's importance. (M., Tr. 2157) . . . At a later point Barker told Hunt that he had also assumed at the time that Hunt was still with the CIA and simply had been positioned at the White House by the agency, a customary CIA practice. (Hunt, Tr. 918-20)."

On September 2, 1971, Hunt and Liddy met Barker, Martinez and De Diego at a hotel in Beverly Hills, California. Hunt informed the defendants that they were to enter Dr. Fielding's office and photograph the files of one of his patients. They were told that Dr. Fielding was not himself the subject of investigation. There was no discussion of authorization for the entry and search. The group met the following day, and Hunt showed Barker and Martinez identification papers and disguises obtained from the CIA.

On the evening of September 3, Barker and De Diego, dressed as delivery men, delivered a valise containing photographic **\*960 \*\*194** equipment to Dr. Fielding's office. Later that evening they and Martinez, having been told that the "Ellsberg" file was the one they were to search for and photograph, entered Dr. Fielding's office and rifled the files. They entered by force, breaking the lock on the office door, and also used force, a crowbar, to open Dr. Fielding's file cabinets. Although the plan was to accomplish entry without force, it also included the alternative that in the event force had to be used, Barker and his colleagues were to make the entry look as if it had been by an addict seeking drugs, and accordingly, before leaving, they scattered pills about the office. The next day Barker and Martinez returned to Miami, having failed to locate the Ellsberg records.

As a defense to the March 7, 1974, indictment for conspiring to violate Dr. Fielding's Fourth

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

546 F.2d 940, 178 U.S.App.D.C. 174
**(Cite as: 546 F.2d 940)**

Amendment rights, Barker and Martinez sought to discover and present evidence as to the reasonableness of their belief in Hunt's authority to conduct the Fielding operation. Their motion for discovery and their proposed instructions based on the defense of reasonable reliance on Hunt's apparent authority were denied by the District Court.[FN6] At trial both defendants were nevertheless given latitude to testify extensively about the circumstances underlying their involvement in the Fielding break-in. The jury was advised that to convict they had to find the purpose of the break-in was to enter and search Dr. Fielding's office without a warrant or permission, and that the conspirators were governmental employees or agents acting for governmental rather than purely personal purposes. The court further instructed the jury that a mistake of fact may constitute a defense to the conspiracy charge, so that if a defendant honestly believed a warrant had been obtained, this mistake of fact would render him innocent, because it would not be said he intended a warrantless search.[FN7]

> FN6. See United States v. Ehrlichman, 376 F.Supp. 29, 35-36 (D.D.C.1974); Barker Appendix at 104-05. The text of the proffered instruction is set out in note 15 infra.

> FN7. Tr. 2524-26. While the trial judge said "valid warrant," there was no testimony or contention that defendants had a belief that a warrant had been obtained. A person can act upon the basis of a warrant that has been issued in fact, even though it is later held invalid, without incurring personal legal responsibility. This would come within the narrow class of cases where a reasonable mistake of law does constitute a defense, as set out in Part IID2, of this opinion. See also Model Penal Code s 2.04(3)(b) (P.O.D.1962).

## II. AFFIRMATIVE DEFENSES

The defendants' principal argument on appeal is the claimed error of the District Court in refusing them a defense based upon their good faith reliance on Hunt's apparent authority. They say the mens rea required for a violation of section 241 was negatived by a mistake of fact "coupled with" a mistake of law.[FN8] They amplify: "The mistake of fact was the belief that Hunt was a duly authorized agent; the mistake of law was that Hunt possessed the legal

prerequisites to conduct a search either probable cause or a warrant." [FN9] In the alternative, they contend that Hunt's inducement estops the government from prosecuting under entrapment principles. I turn to the entrapment question first.

> FN8. Barker Br. at 31.

> FN9. Barker Br. at 31-32.

### A. Entrapment

The defense of entrapment, developed as a construction of legislative intent, has been evolved for the case of an otherwise innocent person who has been induced to commit a crime by a law enforcement agent whose purpose was prosecution. Recognition of the defense works as an estoppel on the government, preventing it from reaping the benefits of the prosecution and conviction it sought to obtain by unconscionable means.[FN10]

> FN10. See Hughes, C. J. in Sorrells v. United States, 287 U.S. 435, 448, 53 S.Ct. 210, 215, 77 L.Ed. 413 (1932): "We are unable to conclude that it was the intention of the Congress in enacting this statute that its processes of detection and enforcement should be abused by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them. . . . This, we think, has been the underlying and controlling thought in the suggestions in judicial opinions that the government in such a case is estopped to prosecute or that the courts should bar the prosecution."

Sorrells was followed in Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed. 848 (1958), and United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In Sherman, 356 U.S. at 372, 78 S.Ct. at 820 Warren, C. J., (in a passage quoted in part with approval of Rehnquist, J. in Russell, 411 U.S. at 434, 93 S.Ct. 1637) stated: "The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. . . . Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations."

**\*961 \*\*195** The entrapment rationale is wholly inapplicable to this case. In recruiting Barker and

546 F.2d 940                                                                                                                    Page 21
546 F.2d 940, 178 U.S.App.D.C. 174
(Cite as: 546 F.2d 940)

Martinez, Hunt was not acting as a law enforcement official seeking to induce their participation in order to have them prosecuted and punished. He instead sought their aid for other governmental ends which his unit judged best served by illegitimate invasion of the rights of others. The true entrapment defense seeks to prevent government officials from realizing benefits from unlawful inducement, and thereby to deter official illegality. Extension of the defense to reach Hunt's inducement of Barker would serve to reinforce the illegal conduct of the government agent, who could then delegate the "dirty work" to private citizens shielded from responsibility by the defense that they had been recruited by a government agent.[FN11]

> FN11. Congress is presently considering a major extension of the entrapment defense in the bill proposed to codify and revise title 18, S. 1, s 551, 94th Cong., 1st Sess. (1975). As of the present, it is not known or knowable whether or in what form this proposal will be passed, and what Congress may contemplate as to cases previously tried.

### B. The Claim of Mistake of Fact

It is settled doctrine that an honest mistake of fact generally negatives criminal intent, when a defendant's acts would be lawful if the facts were as he supposed them to be.[FN12] This is considered a matter of essential fairness.[FN13] Even had the facts been as Barker and Martinez claim now to have supposed them, however, their Fielding break-in would still have contravened the clear requirements of the Fourth Amendment.

> FN12. See, e. g., United States v. Feola, 420 U.S. 671, 686, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975); 1 Wharton's Criminal Law and Procedure s 157, (1957); G. Williams, Criminal Law, The General Part ss 52-74 (2d Ed. 1961); Model Penal Code s 2.04 (1) (P.O.D.) (1962).

> FN13. See H. M. Hart, Jr. "The Aims of the Criminal Law", 23 Law and Contemporary Problems 401, 414 (1958). Cf. Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), and discussion in note 49 infra.

Classifying mistakes as either of fact or of law is not always an unambiguous task.[FN14] At trial, defendants offered an instruction that rather elusively muddled the two types of mistakes, and sent them in an incorrect context as to the "specific intent" required for the crime.[FN15] The brief before this court attempts to correct that prior lack of clarity *962 **196 by advancing the proffered defense with a closer attention to the discrete policies underlying the mistake of fact and mistake of law defenses. It may be convenient to take up the appellants' defense in terms of the recognized doctrinal distinctions before turning to the applicability of exceptions.

> FN14. Generally, Glanville Williams distinguishes between them as follows: "(A) fact is something perceptible by the senses, while law is an idea in the minds of men." Williams, Criminal Law, The General Part (2d ed., 1961), s 100, p. 287.

> FN15. Defendants' proposed instruction read: "You have heard evidence during the course of the trial pertaining to the state of mind of certain of the defendants at the time they agreed to participate and thereafter did participate in the September 3, 1971 entry of the office of Dr. Lewis J. Fielding. I instruct you that a defendant's motives in committing acts which the law forbids are not germane to whether an offense has been committed. However, since specific intent is an essential element of this offense, if a defendant acted out of a good faith belief that what he was doing was with authority of law and not in violation of the law, that is a defense to the crime charged, even if that sincere belief that his actions were lawfully authorized was erroneous."

"This is not to say that a mistake of law on the part of a defendant would constitute a defense to the crime charged. Neither ignorance of the law nor mistake of law would excuse the criminal conduct in this case. However, if actions are taken as the result of mistake of fact, as opposed to ignorance or a mistake of law, then the defendant has not formed the requisite intent for the crime charged. Accordingly, if you find that a defendant believed he was acting out of a good faith reliance upon the apparent authority of another to authorize his actions, that is a defense to the charge in Count I, provided you find that such a mistake by a defendant was made honestly, sincerely, innocently and was a reasonable mistake to make based upon the facts as that defendant perceived them." Barker App.

104-05.

To the extent defense counsel was of the view, as appears from the third sentence of his proposed instruction, that a good faith mistake of law negatives the specific intent required for the crime, this is not sound. See Sec. IIE of this opinion and Sec. IIA of our opinion in U. S. v. Ehrlichman, issued today; United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941).

For purposes of this appeal it can be assumed that Barker and Martinez undertook the Fielding break-in while believing that the ultimate "target" was a foreign security risk for the United States. The defendants do not simply claim that they were factually mistaken about the purpose of their mission, however; they also urge that their error in believing that Hunt was a "duly authorized" agent was a factual error. Although defendants claim to maintain a distinction between mistake of fact and mistake of law, this contention entirely erodes the distinction. Defendants did not claim, or offer to prove a belief, that the President or Attorney General personally authorized the break-in; nor did they seek to advance any other specific factual basis for the belief that Hunt was "duly authorized." They certainly did not offer to prove that they believed John Ehrlichman "expressed or implied that the break-in of Dr. Fielding's office was legal under a national security rationale." (Merhige, concurring at -- of 178 U.S.App.D.C., at 957 of 546 F.2d. They did not seek outside advice about the factual requirements necessary for such an undertaking. The appellants do not claim they mistakenly believed they were acting under a warrant. Nor do they claim any other representation of fact, express or implied, or mistake of fact.

Martinez says he believed that Hunt was still employed by the CIA. He has apparently put himself in a no-lose position on this point, for when his CIA case officer replied to his inquiry that Hunt was not then employed by CIA, he assumed this answer was a ruse or cover. But this mistake of fact whether reasonable or not was irrelevant, for even if Hunt had then been employed by CIA, his employment would not have validated the break-in and search.

At bottom, the defendants' "mistake" was to rely on Hunt's White House and CIA connections as legally validating any activities undertaken in the name of national security. They had been told that the matter

was something that could not be handled by the FBI because of court decisions or by the CIA because of its limited jurisdiction. Martinez conceded in testimony that he was aware that the operation might have been illegal for a "normal citizen" (Tr. 2170). Barker and Martinez did not consider themselves "normal" because of their putative status as CIA-White House operatives. Their mistake as to who or what the law authorized or required cannot be repackaged as a mistake of "fact" that Hunt had been duly authorized.

It can be assumed for present purposes that defendants mistakenly believed they were entering Dr. Fielding's office in order to get information on some other person who was a "traitor." However, their actions taken pursuant to that mistaken belief did not conform with the law's requirements. The fundamental right to be free from warrantless physical searches has been clear since Boyd v. United States [FN16] recognized that such cases as Entick v. Carrington**963 **197 [FN17] so intensely affected the framers that those cases have long been taken "as sufficiently explanatory of what was meant by unreasonable searches and seizures." [FN18] Even when the Executive acts to avert foreign security dangers, no Federal judge, indeed no Department of Justice submission, has ever suggested that action otherwise clearly prohibited by the Fourth Amendment would be valid in the absence of explicit authorization by the President or Attorney General. No generally delegable power to authorize such searches is reconcilable with the requirements of the Fourth Amendment. [FN19]

FN16. 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

FN17. 95 Eng.Rep. 807 (1765). Lord Camden upheld damages against Lord Halifax, the Secretary of State who issued the general warrant to seize papers in a case of seditious libel, holding this had never been authorized by a court, other than Star Chamber, and was not a valid justification for a trespass.

FN18. 116 U.S. at 627, 6 S.Ct. at 530.

FN19. See discussion in the companion opinion of United States v. Ehrlichman at Sec. IIB1, and the District Court's reliance on the defendants' failure to allege Presidential or Attorney General

authorization, 376 F.Supp. at 34.

On the separate issue of whether physical searches can properly be included in a foreign security exception to the warrant requirement, the Special Prosecutor says No, while the Attorney General has filed a short memorandum saying Yes, if specifically authorized by the President or the Attorney General.[FN20] The fact that defendants do not assert a belief that the President or Attorney General authorized their violation of Dr. Fielding's fundamental right to be free of warrantless government forays into his office takes this case outside the mistake of fact defense, for whatever defendants' other beliefs as to the facts, they would not, if true, establish exculpation.

> FN20. The fact that the Attorney General has recently and so far as we are aware for the first time made the claim that there is a "national security" exception that would permit physical intrusion in a citizen's home or office on specific approval of the President or Attorney General, even in the absence of a warrant, does not mean that the law on this position is now to be regarded as clouded with doubt so as to remove such actions from the scope of section 241.

In an earlier case involving these same defendants, and roughly the same defense as that advanced here, Judge Wilkey rejected the argument that "an error as to the legality of a particular activity, even if based upon the assurances of a governmental official" can be treated as a mistake of fact. He recognized the importance of the issue, for a mistake of fact defense would justify conduct whenever the mistake was honest whether reasonable or not, while the mistake of law defense, if held applicable, justifies conduct only if the mistake is reasonable. United States v. Barker, (dissent) 168 U.S.App.D.C. 312, 514 F.2d 208, 264-68 & n. 76 (1975). I subsequently consider whether the mistake of law defense should be expanded to reach this case. But certainly this should not be done behind the screen that what is involved is a mistake of law. Defendants cannot avoid the limitations that have historically shaped exculpation because of legal mistake, by characterizing as factual error their belief that a generalized aura of executive branch authorization warranted their nighttime intrusion.

C. Mistake of Law Generally

Viewed as a mistake of law, the defense raised by defendants requires us to confront a fundamental tension in our criminal law. The criminal law relies in general on the concept of culpability or blameworthiness as a prerequisite to guilt, expressed as a requirement of mens rea.[FN21] The Supreme **\*964 **198** Court has, however, rejected Blackstone's formulation that a "vicious will" is necessary to constitute a crime, see Lambert v. California, 355 U.S. 225, 228, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957), and as a society we have stopped short of requiring a subjective behavioral assessment of each offender's individual stock of knowledge about the law and its applicability.[FN22] Instead, "the rule that 'ignorance of the law will not excuse' . . . is deep in our law." Lambert v. California, 355 U.S. at 228, 78 S.Ct. at 243, quoting Shevlin-Carpenter Co. v. Minnesota, 218 U.S. 57, 68, 30 S.Ct. 663, 54 L.Ed. 930 (1910). The Supreme Court has generally refused to recognize a defense of ignorance of, or mistake as to, the requirements of the law violated, even when the mistake refutes any subjective moral blameworthiness in the offender. See, e. g., United States v. Park, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975); United States v. International Minerals & Chemical Corp., 402 U.S. 558, 563, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971). United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971); United States v. Dotterweich, 320 U.S. 277, 284, 64 S.Ct. 134, 88 L.Ed. 48 (1943).[FN23] Similarly, the A.L.I.'s Model Penal Code s 2.02(9) defines the requirements of culpability so that "neither knowledge nor recklessness nor negligence as to whether conduct constitutes an offense or as to the existence, meaning or application of the law determining the elements of an offense is an element of such offense unless the definition of the offense or the Code so provides." [FN24]

> FN21. H. Packer, The Limits of the Criminal Sanction 112-21 (1968), explains the use of culpability as an "appropriate criterion for limiting the reach of state intervention", "transcend(ing a) calculus of crime preventing." But see J. Hall, General Principles of Criminal Law 77-83 (2d ed. 1960), concluding that even in the earliest cases mens rea was concerned with the intentional doing of a wrongful act and not a general notion of moral blameworthiness; Seney, " 'When Empty Terrors Overawe' Our Criminal Law Defenses," 19 Wayne

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

L.Rev. 947, 969 (1973), conceptualizing criminal law as imposing a positive duty upon individuals to refrain from antisocial conduct.

FN22. But see Hall and Seligman, "Mistake of Law and Mens Rea," 8 U.Chi.L.Rev. 641 (1941). (Hereinafter cited as Hall and Seligman). Of course, totally subjective assessments of an accused's state of mind can never be fully realized. For example, a finding of the subjective intent required for a first degree murder conviction may be and frequently is based on objective inferences from evidence other than direct evidence of the state of mind.

FN23. Only where scienter is "historically required", as in embezzlement or larceny (see Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1951), discussed in U. S. v. Freed, 401 U.S. at 607 n. 13, 91 S.Ct. 1112), or where the circumstances requiring the law's application do not "alert the doer to the consequences of his deed" (Lambert, 355 U.S. at 228, 78 S.Ct. at 243) has ignorance of the law been recognized by the Supreme Court as an excuse.

FN24. (P.O.D.1962). See also S. 1, supra note 11, s 303(d)(1) "Existence of Offense Proof of knowledge or other state of mind is not required with respect to: (A) the fact that particular conduct constitutes an offense or is required by or violates a statute or a regulation, rule, or order issued pursuant thereto; (B) the fact that particular conduct is described in a section of this title; or (C) the existence meaning, or application of the law determining the elements of an offense. This careful specification of the elements of an offense is consistent with "(t)he modern practice in drafting penal legislation . . . to specify defenses when intended." United States v. Moore, 158 U.S.App.D.C. 375, 413, 486 F.2d 1139, 1177, cert. denied 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973).

The general principle that rejects the defense of ignorance of the requirements of the criminal law, or of mistake as to those requirements, is not a casual or happenstance feature of our legal landscape. It formed a part of English and canon law for centuries and all the time with recognition that it diverged from an approach of subjective blameworthiness.[FN25] Its continuing vitality stems from preserving a community balance, put by Holmes as a recognition that "justice to the individual is rightly outweighed by the larger interests on the other side of the scales." [FN26] Great minds like Holmes and Austin have struggled with the tension between individual injustice and society's need and have concluded that recognition of the mistake of law defense would encourage ignorance rather than a determination to know the law, and would interfere with the enforcement of law, because**965 **199 the claim would be so easy to assert and hard to disprove.[FN27]

FN25. See Hall & Seligman's summary, supra at 643-46.

FN26. Holmes, The Common Law 48 (1881).

FN27. As to the doctrinal support for their positions, an excellent summary is presented in Hall & Seligman, supra at 646-651.

In some aspect the doctrine may be viewed as a doctrine of negligence, holding individuals to minimal conditions of responsibility and making acting without legal knowledge blameworthy for the failure to obtain that knowledge.[FN28] Hall suggests in addition that the rationale can be expressed in terms of ethical policy that the criminal law represents certain moral principles and that to recognize ignorance or mistake of law as a defense would contradict those values.[FN29] Still, it must in the last analysis be recognized that at its core, the basic mistake of law doctrine imposes liability even though defendant acted in good faith and made a "reasonable" mistake. Otherwise, criminal statutes would be in suspense on any point not authoritatively settled.[FN30] In a particular case adherence to a generally formulated rule may seem to work injustice, but the jurists pondering the general doctrine have both deemed such individual hardships outweighed by the common good, and have taken into account that certain features of the overall system of criminal justice permit amelioration and relief.[FN31] These flexible opportunities for mitigating the law's impact through prosecutorial discretion,[FN31a] judicial sentencing, and executive clemency avoid the necessity of bending and stretching the law, at the price of undermining its general applicability.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN28. Hart, "The Aims of the Criminal Law," 23 Law and Contemporary Problems 401, 413 (1958).

FN29. "The criminal law represents an objective ethic which must sometimes oppose individual convictions of right. Accordingly, it will not permit a defendant to plead, in effect, that although he knew what the facts were, his moral judgment was different from that represented in the penal law." Hall, "Ignorance and Mistake in Criminal Law," 33 Ind.L.J. 1, 21 (1957), quoted in Report of the Senate Committee on the Judiciary, Criminal Justice Codification, Revision and Reform Act of 1974, Vol. II, p. 96.

FN30. It would fairly be argued that no liability attaches for e. g., action taken under a "reasonable", though erroneous, forecast of how far the courts might go in confining a statute through the doctrine of strict construction. Litigation could come to depend not on what the statute meant, but on the reasonableness of a legal view of its meaning.

FN31. If the social harm in a particular case is slight and the ignorance of the law on the part of the offender is fairly obvious, the state may wisely refrain from prosecution in his case. In certain other cases ignorance of law may be considered by the court in mitigation of punishment, or may be made the basis of an application for executive clemency. But if such ignorance were available as a defense in every criminal case, this would be a constant source of confusion to juries, and it would tend to encourage ignorance at a point where it is peculiarly important to the state that knowledge should be as widespread as is reasonably possible.
R. Perkins, Criminal Law 925 (2d ed. 1969). (footnotes omitted).

FN31a. The Justice Department decision against prosecuting Richard Helms may be a sound example of prosecutorial discretion shielding against the cut of the law. It should be noted that unlike the defendants in this case, Helms arguably acted in obedience to a duty imposed by statute, and thus might

have come within the compass of a mistake of law defense grounded in the actor's being under a duty to act.

Every mature system of justice must cope with the tension between rule and discretion. Rules without exceptions may grind so harsh as to be intolerable, but exceptions and qualifications inflict a cost in administration and loss of control. The balance struck by the doctrine with which we are now concerned provides for certain rigorously limited exceptions (inapplicable to defendants' claim) but otherwise leaves amelioration of harsh results to other parts of the system of justice. In my view, history has shaped a rule that works, and we should be slow to tinker. Consequently, defendants here must be held to a responsibility to conform their conduct to the law's requirements. To hold otherwise would be to ease the path of the minority of government officials who choose, without regard **\*966 \*\*200** to the law's requirements, to do things their way, and to provide absolution at large for private adventurers recruited by them.

D. Exceptions to the Mistake of Law Doctrine

I do not discount defendants' claims that their background, and particularly their previous relations with the CIA [FN32] and Hunt explain their good faith reliance on Hunt's apparent authority and their consequent failure to inquire about the legality of the activities they were to undertake on his request. [FN33] I feel compassion for men who were simultaneously offenders and victims, and so did the trial judge when it came to sentencing. But testing their special circumstances against analogies they rely on to project a mistake of law defense, leads me to reject their claim to be relieved of personal accountability for their acts.

FN32. However, the CIA's statutory authority does not extend to domestic intelligence activity. 50 U.S.C. s 403(d)(3) (1970).

FN33. Although Barker and Martinez are American citizens, they are in a sense arguing that they could not be expected to make the right judgments about the requirements of American law because they were accustomed to Cuba's more authoritarian culture. See Bazelon, J. concurring in United States v. Barker, 168

U.S.App.D.C. 312, 514 F.2d at 235 n.38. However under American jurisprudence an alien or naturalized citizen status does not excuse compliance with the criminal law. Cf. United States v. De La Garza, 149 U.S.App.D.C. 200, 462 F.2d 304 (1972).

1. Claim of Good Faith Reliance on an Official's Authority

Appellants invoke the acceptance of good faith reliance defenses in the Model Penal Code. However, the American Law Institute carefully limited the sections cited to persons responding to a call for aid from a police officer making an unlawful arrest,[FN34] and to obeying unlawful military orders,[FN35] and specifically rejected the defense for other mistake of law contexts.[FN36] In both instances, the A.L.I. recognizes limited curtailment of the doctrine excluding a mistake of law defense on the ground that the actor is under a duty to act [FN37] to help a police officer in distress to make an arrest when called upon, or to obey military orders. In each case, society has no alternative means available to protect its interest short of imposing a duty to act without a correlative duty to inquire about the legality of the act. [FN38] Punishing an individual for *967 **201 failure to inquire as to the lawful basis for the officer's request would frustrate the effective functioning of the duly constituted police (and military) force and in its operation on the individual would compel a choice between the whirlpool and the rock.[FN39]

FN34. See e. g., Model Penal Code s 3.07(4) (P.O.D.1962):
(4) Use of Force by Private Person Assisting an Unlawful Arrest.
(a) A private person who is summoned by a peace officer to assist in effecting an unlawful arrest, is justified in using any force which he would be justified in using if the arrest were lawful, provided that he does not believe the arrest is unlawful.
(b) A private person who assists another private person in effecting an unlawful arrest, or who, not being summoned, assists a peace officer in effecting an unlawful arrest, is justified in using any force which he would be justified in using if the arrest were lawful, provided that (i) he believes the arrest is lawful, and (ii) the arrest would be lawful if the facts were as he believes them to be.

FN35. See Model Penal Code s 2.10 (P.O.D.1962). See also Williams Criminal

Law s 105, 296-301; United States v. Calley, 22 U.S.M.C.A. 534 (1973).

FN36. When s 3.07(4) does not specifically apply, s 3.09(1) withdraws any justification defense to the use of improper force where the actor's "error is due to ignorance or mistake as to the provisions of the Code, any other provision of the criminal law or the law governing the legality of an arrest or search." The Commentary explained that provision as dealing with a "body of law (which) is not stated in the Code and may not appear in the form of penal law at all. It seems, clear, however, that the policy which holds mistake of penal law to be immaterial applies with no less force to the law of arrest or search." A.L.I. Model Penal Code s 3.09(1) comment referring to s 3.04(1) comment (Tent. Draft, No. 8, 1958), at 18.

FN37. An analogous defense under proposed S. 1 is s 541 (Exercise of Public Authority), which justifies conduct by private individuals done at the direction of a public servant where the conduct was required or authorized by law. Because their conduct was neither required nor authorized, Barker and Martinez fall outside the scope of this proposed exception.

FN38. A similar rationale underlies the exception for reliance on government authority when acting under a public duty. See Model Penal Code s 3.03 (P.O.D.1962).

FN39. Even under circumstances of conflicting obligations, the reasonableness of a soldier's obedience to an unlawful order is tested against the objective standard provided by "a man of ordinary sense and understanding." 22 U.S.C.M.A. supra, at 542-43. See also footnote 31a supra.

There is no similar incapacity of the government to act to protect its ends when a citizen takes action when he is under no duty to do so. Thus under the Model Penal Code, a citizen who volunteers to assist another citizen, or volunteers to assist a police officer in making an unlawful arrest, cannot avail himself of the defense available to a person responding to an officer's call that he participated without making an inquiry as to whether the arrest was lawful. The volunteer is exculpated only if he believed that the arrest was lawful and believed in the "existence of

facts which, if they existed, would render the arrest valid." [FN40] Thus, even if private citizen intervention appears socially desirable in a particular case, the citizen's scope of action and protection in the event of mistakes are narrow, because, overall, forceful citizen enforcement of the law is susceptible of abuse [FN41] and mischief.

> FN40. A.L.I. Model Penal Code, s 3.07(4)(b), see note 33 supra; Comment (Tent. Draft No. 8, p. 65 (1958). Cf. Proposed S. 1, s 544(b) (similar provision for recognizing defenses based on justifiable conduct predicated on a mistake about the factual situation).

> FN41. See, e. g., U. S. v. Hillsman, 522 F.2d 454, (7th Cir. 1975), holding that defendant's attempted citizen's arrest of a fleeing felon was improper under Indiana law because validity of such an arrest rests on whether a felony (a question of fact and of law) had in fact been committed by the arrestee, and no felony had in fact been committed.

Barker and Martinez were under no tension of conflicting duties comparable to that experienced by a soldier or citizen responding to orders. They had and claim no obligation to aid Hunt. Nor did they have a belief of fact rendering their voluntary assistance lawful within s 3.07(4), supra note 33. Nor is there a compelling social interest to be served in allowing private citizens to undertake extra-legal activities, acting simply on the word of a government official. The purposes of the law in rejecting such a defense are underscored by the very kinds of extra-governmental, outside-normal-channels conduct that Barker and Martinez engaged in here. Government officials who claim to be seeking to implement the ends of government by bypassing the agencies and personnel normally responsible and accountable to the public transmit a danger signal. Barker and Martinez acted to help Hunt on his explanation that he sought their recruitment because the FBI's "hands were tied by Supreme Court decisions and the Central Intelligence Agency didn't have jurisdiction in certain matters." [FN42] There is reason for the law to carve out limited exceptions to the doctrine negating defenses rooted in mistake of law, but the pertinent reasons have minimal weight, and face countervailing policies, when they are invoked for situations that on their face are outside the basic channels of law and government in this case, requests

for surreptitious or, if necessary, forcible entry and clandestine files search. These are plainly crimes, malum in se, unless there is legal authority. Citizens may take action in such circumstances out of emotions and motives that they deem lofty, but they must take the risk that their trust was misplaced, and that they will have no absolution when there was no authority for the request and their response. If they are later to avoid the consequences of criminal responsibility, it must be as a matter of discretion. To make the defense a matter of right would enhance the resources available to individual officials bent on extra-legal government behavior. The purpose of the criminal law is to serve and not to **968 **202 distort the fundamental values of the society.

> FN42. Barker, Tr. 2197.

2. Exception for Official Misstatements of Law

Although defendants relied on the analogy to a police officer's request for assistance, Judge Merhige votes to reverse on the ground that appellants could claim as a defense that a citizen has a right to take action in reliance on a government official's assurance that such action is permissible. The Model Penal Code has addressed itself to that broad problem, and has approved a defense that is narrowly confined in order to protect social interests. [FN43] Its provision yields no excuse for defendants' conduct. Section 2.04(3) of the Code provides a carefully and properly drawn recognition of a defense based on reasonable reliance on a statute, judicial decision, administrative order or "an official interpretation of the public officer or body charged by law with responsibility for the interpretation, administration or enforcement of the law defining the offense." Mainly directed to the mala prohibita offenses, the categories protected "involve situations where the act charged is consistent with entire law-abidingness of the actor, where the possibility of collusion is minimal . . ." [FN44]

> FN43. A similar approach appears in s 552 of S. 1, supra note 11.

> FN44. Model Penal Code, Tentative Draft # 4 Commentary at 138 (1955).

The section contemplates both accountability and responsible action on the part of the government official giving advice about the law. But defendants do not claim they received any advice, either express

or implied, from Ehrlichman, and Hunt had only an ad hoc, undefined position in the White House.[FN45] He had no on-line enforcement or interpretative powers or responsibilities. His undifferentiated power stemmed solely from membership in a large White House bureaucracy.[FN46] The potential for official abuse of power would be greatly magnified if such a government official can recruit assistance from the general public, constrained neither by accountability guidelines guiding agency action under statutorily mandated powers, nor by the recruited citizen who, under the defendants' formulation, would be under no duty to inquiry about the legality of the official's request.[FN47]

> FN45. The Room 16 unit did not even have an Executive Order formally creating it or endowing it with any powers. Cf. the classified Executive Order used to create the National Security Agency (Nov. 4, 1952, U.S. Govt. Org. Manual 185-86 (1969-70)), discussed in Walden, "The CIA: A Study in the Arrogation of Administrative Powers" 39 Geo.Wash.L.Rev. 66, 67 (1970).

> FN46. The way that bureaucracy acquires power and handles its conflicts with agency personnel and policy is examined at length in Thomas, "Presidential Advice and Information: Policy and Program Formulation, 35 Law and Contemporary Problems 540 (1970).

> FN47. The potentially broad range of illegal activities that a government official might request a private citizen to do, would make it impossible to rely on the educational value that normally inheres when mistake of law is recognized as an excuse in one case that serves to define the law for similarly circumstanced offenders in the future. See, e. g., Fletcher, "The Individualization of Excusing Conditions," 47 So.Cal.L.Rev. 1269, 1304-05 (1974).

To stretch the official misstatement of law exception for the facts of this case is to undercut the entire rationale for its recognition as an exception. The Model Penal Code hedges in the defense to permit reliance only on an "official interpretation of the public officer . . . charged by law with responsibility for the interpretation, administration or enforcement of the law defining the offense." (emphasis added).

Certainly Hunt cannot sensibly be described as having been charged by law with responsibility for interpreting or enforcing either s 241, or the Constitution from which the violations of s 241 in this case sprang. Nor can it be said in any meaningful sense that he had the power to provide an official interpretation of the law. These restrictions on the applicability of the official statement exception did not arise haphazardly; they were deliberately drafted to allow, and indeed to promote, good faith reliance on official pronouncements with **969 **203 objective indicia of reliability those made by officials specifically charged with interpreting or enforcing the specific law defining the specific offense charged against the defendant. A defense so confined has values for the law: It avoids punishing those who rely on a crystallized position taken by the officer or body charged by statute with interpreting the law in a particular area.[FN47a] The officer's position in a channel of authority is readily identifiable; any mistakes he makes can be remedied by readily perceived and structured avenues of relief. There is no opening the door to justification for serious offenses based on unrecorded discourse from someone who has an undefined but high-sounding berth in the government.

> FN47a. Cf. National Automatic Laundry and Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 287-289, 443 F.2d 689, 702-04 (1971).

The "official interpretation" defense thus structured is a functional analogue of the defenses of reliance on a statute, judicial decision or administrative order. It is justified by its twin underlying assumptions that the official is one to whom authority has been delegated to make pronouncements in a field of law, and that the authority can be held accountable by explicitly grounding it in the hands of an identifiable public official or agency. So grounded, the interest of both private citizens and government is served by protecting actions taken in reliance on that interpretative authority. But none of these safeguards of regularity is present in this case. A staff man or even a lower echelon official of the White House may be taken as a man of presumptive standing and even influence, but not seriously as a source of official interpretation of law, much less of such matters as the validity of a stealthy breaking and entering. Even cases postulating a national security exception for wiretaps have never suggested more than that the President or the Attorney General could have authority to evaluate and authorize an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

exception. No claim of Presidential or Attorney General authorization has been made in this case. The official misstatement of law defense embodies a fundamental requirement that the erroneous interpretation be made by an official in fact possessing the power to make a binding interpretation; it is wholly inapplicable to a case like this, of a claim of reliance on a government official in an area in which he has no power to interpret. And it is blatant incongruity to stretch an escape clause for mistakes of law arising in the innately public business of official interpretations of law to immunize a secret conference for planning a stealthy entry into a private home or office.

### 3. The Inapplicability of Other Exceptions

While a mistake of law may negative a specific element of certain crimes, [FN48] or may be accepted where the mistake pertains to a violation of purely civil law as contrasted with the requirements of the criminal law, [FN49] none of these carefully wrought exceptions have application to the case at bar. Defendants' mistake of law did not pertain to some rule irrelevant to or remote from the criminal law. Nor does section 241 recognize a mistake of law defense or require a specific intent like the statute at issue in People v. Weiss, 276 N.Y. 384, 12 N.E.2d 514 (1938), punishing a "willful" seizure of a person with "intent to (act), without authority of law."

> FN48. See, e. g., Mistake s 521 in S. 1; Model Penal Code s 2.04 (P.O.D.1962). The possibility of a definition of particular crimes to permit exculpation by mistake of law does not contradict the general rule denying exculpation. "The prevailing general rule for criminal responsibility is that, unless the legislature indicates its intention to make it so, ignorance or mistake of law is no defense." Report of the Senate Committee on the Judiciary, Criminal Justice Codification, Revision and Reform Act of 1974, Vol. II, p. 94.

> FN49. See, e. g., Williams, Criminal Law: The General Part, s 117, Fletcher, "The Individualization of Excusing Conditions, 47 So.Cal.L.Rev. 1269 (1974) at 1272. Williams suggests that a mistake as to purely "civil " law is exculpatory while a mistake as to the "criminal" law is not. See G. Williams, supra ss 107-117, p. 304-451.

Hart, supra at 431 n. 70 explains Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1951), as a "claim of right" civil law mistake.

*970 **204 E. The "Specific Intent" Requirement of the Civil Rights Offenses

This brings me to the question whether the civil rights offenses involved here are of such a character, either in terms of required intent or affirmative defense, as to make available an extension of criminal defenses to include mistake of law. I conclude, on the contrary, that this consideration reinforces the rejection of the proffered defense.

The court is dealing here with violations of civil rights. We all agree that "the law is clear that Dr. Fielding's Fourth Amendment rights were breached when the defendants broke into and searched his office without the requisite judicial authorization" and that they acted with "a purpose to invade constitutionally protected interests." (Ehrlichman, 178 U.S.App.D.C. 144, at --, 546 F.2d 910, at 928). Unless we are willing to undercut criminal enforcement of the civil rights offenses, it is entirely impermissible to stretch doctrines of mistake of law to reach the result of excusing that violation of Fourth Amendment rights. The majority excuses defendants' conduct on their contention of mistaken reliance on official lawlessness even though conspiracy for illegal government purposes with government officials is the gravamen of the offenses charged. What the reversals accomplish is an erosion of pertinent Supreme Court rulings rejecting contentions based on "specific intent."

Conviction under Section 241 requires that the offender acted with a "specific intent" [FN50] "to injure, oppress, threaten or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States . . ." This does not mean that he must have acted with subjective awareness that his action was unlawful; nor need the defendant have thought in constitutional terms while acting. See, e. g., Screws v. United States, 325 U.S. 91, 104-07, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). It is enough that the constitutional right is clearly defined and that the conspirators intend to invade interests protected by the Constitution. [FN51]

> FN50. See, e. g., United States v. Guest, 383 U.S. 745, 753-54, 86 S.Ct. 710, 16 L.Ed.2d

239 (1966).

FN51. As our companion opinion in United States v. Ehrlichman illustrates, Dr. Fielding's right to be free of a warrantless search was clear at the time of the break-in.

In essence, defendants Barker and Martinez claim that the destructive social impact wrought by their invasion of another's civil rights is exonerated by the law so long as an individual is acting at the request of a government official and on his implication that he has legal authority. The price to society of tolerating reliance on the very official misconduct s 241 was directed against, forces us to reject defendants' argument.[FN52] As the Supreme Court made clear in Screws,[FN53] the scope and significance of the all-important civil rights criminal statutes are not to be cabined or cut down, either by expanding scienter requirements to include knowledge of law or by enlarging defenses based on ignorance or mistake of law. A private citizen must start with a beginning point in his understanding of what the law requires. Breaking and entering a home or office is malum in se a gross and elementary crime when done for personal reasons, a gross and elementary violation of civil rights when done with the extra capability provided by a government position. Defendants were charged and convicted of violating a clearly defined constitutional*971 **205 right. [FN54] They were not acting in an official law enforcement capacity. Cf. Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 456 F.2d 1339 (2d Cir. 1972).[FN55] Their defense instead reduces to an arguable but untested speculation that their otherwise unlawful behavior would be vindicated by a foreign security exemption to the Fourth Amendment's protections. In regard to subjective "good faith," they are indistinguishable from any other criminal defendant who deliberately breaks the law in the mistaken expectation that he can assert a constitutional defense at trial or one who is civilly disobedient because his framework for moral action does not coincide with his society's legal framework.[FN56] Such persons frequently act on a high plane of patriotism, as they view it, but that does not allow them to proceed in ignorance or disregard of the requirements of law. [FN57]

FN52. See United States v. Konovsky, 202 F.2d 721, 730-31 (7th Cir. 1953):

If a police officer acts intentionally under color of his office to subject a citizen to deprivation of his constitutional rights, he cannot justify his action in that respect by orders from his superiors . . . (A)ny instruction to the jury must carefully point out the distinction between the duty of an officer to allow (sic) his superior's instructions in the performance of his duty and the equal duty not to aid and abet in the deprivation of citizens' rights.

FN53. 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).

FN54. See part II of this opinion.

FN55. The Bivens court balanced the need to protect agents' lives in the course of their duties with the citizens' constitutional rights and held that "it is a defense to allege and prove good faith and reasonable belief in the validity of the arrest and search" to a damage action based on unconstitutional search and seizure. 456 F.2d at 1348. Although it is not clear that recognized civil defenses should be automatically applied to the criminal law context (see e. g. O'Shea v. Littleton, 414 U.S. 488, 503, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)), the defense recognized in Bivens does not in any case aid defendants here. The Bivens defense is applicable in an official law enforcement context where the complex law of probable cause must be applied to widely differing congeries of facts; by contrast, the law governing search and seizure without a warrant or Presidential/Attorney General approval is clear and plainly applied to prohibit the conduct Barker and Martinez engaged in. See also Wood v. Strickland, 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), on remand, Strickland v. Inlow, 519 F.2d 744 (8th Cir. 1975) (holding a school board member in a 42 U.S.C. s 1983 (1970) action to a standard of conduct based "on knowledge of the basic, unquestioned constitutional rights of his charges."). Barker and Martinez had a similar responsibility to know the law.

FN56. See, e. g., United States v. Cullen, 454 F.2d 386, 392 (7th Cir. 1971) ("proof of motive, good or bad, has no relevance to (proving requisite intent)"); United States v. Malinowski, 472 F.2d 850, 856, (3d Cir.) cert. denied, 411 U.S. 970, 93 S.Ct. 2164, 36 L.Ed.2d 693 (1973) ( "We agree with the

district court that 'whatever motive may have led him to do the act is not relevant to the question of the violation of the Statute.' Were the state of the law otherwise, a defendant's transgressions would go unpunished so long as he proved a sincere belief in the impropriety of the statutory goal"); United States v. Moylan, 417 F.2d 1002, 1009 (4th Cir. 1969), cert. denied, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970). It has been suggested, but not as yet implemented, that defendants in test cases should be allowed to assert their good faith belief in the unconstitutionality of a law as a mistake of law defense. See Dworkin, "On Not Prosecuting Civil Disobedience," 10 N.Y.Rev. of Books 14 (June 6, 1968). One commentator dealing with assessing criminal responsibility of the political offender concludes, however, that considering motive as a factor in mitigation of sentence rather than as an exculpating excuse would be the "most pragmatic proposal" for dealing with such offenders. Note, Criminal Responsibility and the Political Offender, 24 American U.L.Rev. 797, 833 (1975).

FN57. Barker and Martinez contend, as a separate point, that they lacked "specific intent" to violate a federal right of Dr. Fielding, because the warrantless entry and search of his office were only incidental to their primary purpose of photographing Daniel Ellsberg's medical file, an objective they characterize as at best a state offense outside the reach of section 241. The Supreme Court's most recent pronouncement on the requirements of section 241 in Anderson v. United States, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974), makes clear that "if one of (the purposes of the conspiracy) whether primary or secondary be the violation of federal law, the conspiracy is unlawful under federal law."

### III. CONCLUSION

I do not propose to consider whether appellants were unreasonable in accepting a particular view of the law. In the first place, Barker and Martinez do not urge as justification that they had a specific view of the law, but rather that they are entitled to absolution because they relied on a government employee's

credentials and his assurance, by implication, that their action was lawful. Even so, one might well raise the question as to how appellants could reasonably believe that what they were doing was **972 **206 lawful when they were told they were called in because the action would have been unlawful for the F.B.I.

The ultimate point is that appellants' mistake of law, whether or not it is classified as reasonable, does not negative legal responsibility, but at best provides a reason for clemency on the ground that the strict rules of law bind too tight for the overall public good. Any such clemency is not to be obtained by tinkering with the rules of responsibility but must be provided by those elements of the system of justice that are authorized by law to adjust for hardship and to provide amelioration. We should refuse to cut away and weaken the core standards for behavior provided by the criminal law.[FN58] Softening the standards of conduct rather than ameliorating their application serves only to undermine the behavioral incentives the law was enacted to provide. It opens, and encourages citizens to find, paths of avoidance instead of rewarding the seeking of compliance with the law's requirements. The criminal law cannot "vary legal norms with the individual's capacity to meet the standards they prescribe, absent a disability that is both gross and verifiable, such as the mental disease or defect that may establish irresponsibility. The most that it is feasible to do with lesser disabilities is to accord them proper weight in sentencing." [FN59]

FN58. My rejection of the defendants' mistake of law defense also leads me to reject defendants' contention that failure to present evidence on their claimed defense to the grand jury requires dismissal of the indictment. Nor is an indictment subject to dismissal because of challenges to the competency or sufficiency of the evidence before the grand jury. See United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); Costello v. United States, 350 U.S. 359, 363-64, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

FN59. A.L.I. Model Penal Code s 2.09, Comment (Tent. Draft No. 10, 1960), at 6.

The sentence performed its proper function here. Our system is structured to provide intervention points that serve to mitigate the inequitable impact of

546 F.2d 940                                                                                                          Page 32
546 F.2d 940, 178 U.S.App.D.C. 174
**(Cite as: 546 F.2d 940)**

general laws while avoiding the massive step of reformulating the law's requirements to meet the special facts of one hard case. Prosecutors can choose not to prosecute, for they are expected to use their "good sense . . . conscience and circumspection" to ameliorate the hardship of rules of law. [FN60] Juries can choose not to convict if they feel conviction is unjustified, even though they are not instructed that they possess such dispensing power. [FN61] In this case, Barker and Martinez were allowed to testify at length about the reasons motivating their involvement in the Fielding operation. This was an exercise of discretion by the judge that gave elbow room to both defendants and jury.[FN62]

> FN60. U. S. v. Dotterweich, 320 U.S. 277, 285, 64 S.Ct. 134, 88 L.Ed. 48 (1943), quoted in part in United States v. Park, 421 U.S. 658, 669-70, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975).

> FN61. See United States v. Dougherty, 154 U.S.App.D.C. 76, 473 F.2d 1113 (1972).

> FN62. While not strictly congruent with the law underlying the instructions later given to the jury it did not involve the judge in an affirmative mis-statement of the law. The extra latitude in terms of what may be presented to the jury may be viewed as a historic resonance in practice from the days when juries had the power to set punishment as well as to convict, and evidence was admissible at trial in mitigation of punishment. Williams, Criminal Law supra at 291.

In sentencing Barker and Martinez after they were convicted to only three years probation, the trial judge made a subjective evaluation of the defendants' conduct in light of the goals of the criminal law.[FN63] Barker and Martinez's patriotic motives, good intentions, and prior experience with the CIA and Hunt must all have influenced the sentence imposed.[FN64] The trial judge **\*973 \*\*207** exercised his sentencing power to distinguish, in terms of degree of moral guilt, between appellants Barker and Martinez and codefendant Ehrlichman. But sympathy for defendants, or the possibility that their mistake might be considered "reasonable" given their unique circumstances, must not override a pragmatic view of what the law requires of persons taking this kind of action. I come back again and

again, in my mind to the stark fact that we are dealing with a breaking and entering in the dead of night, both surreptitious and forcible, and a violation of civil rights statutes. This is simply light years away from the kinds of situations where the law has gingerly carved out exceptions permitting reasonable mistake of law as a defense cases like entering a business transaction on the erroneous advice of a high responsible official or district attorney, or like responding to an urgent call for aid from a police officer. I dissent.

> FN63. I am well aware that there are differences between probation and acquittal the judgment of leniency being made by a judge and not a jury and a felony conviction having possible collateral effects in such matters as voting and employment. But if the situation does not prompt a failure to prosecute, the possibility of suspension of imposition of sentence and probation remains an important amelioration that avoids a breach in the law's resolution of interests.

> FN64. Establishment and vindication of the law need not be accomplished by a heavy penalty. See, e. g., Hall and Seligman, supra at 650; Note, Political Offenders, supra at 828-832.

Moreover, the trial judge took account of sentence served for the Watergate break-in. (Sentencing Tr. p. 10). It is not uncommon for trial judges to provide for concurrent service of sentence on unrelated crimes; here, the confinement on the prior sentence had already terminated.

C.A.D.C. 1976.

U.S. v. Barker

546 F.2d 940, 178 U.S.App.D.C. 174

END OF DOCUMENT